# STATE v. ERWIN JONES.

152 N. W. (2d) 67.

June 30, 1967—No. 40,468.

*Joseph R. Gunderson, Moonan & Moonan,* and *Ray G. Moonan,* for appellant.

*Douglas M. Head,* Attorney General, *Gerard W. Snell,* Solicitor General, and *S. A. Sawyer,* County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was convicted of burglary and assault and appeals from an order denying his alternative motion for acquittal or a new trial.

On January 7, 1965, sometime after midnight, one William Cozart and an accomplice entered the Winona Senior High School for the purpose of committing a burglary. They procured a portable acetylene torch from the school welding shop and took it to the superintendent's office, where they began cutting through a vault door on a walk-in safe. They heard

a noise out in the hall and Cozart's accomplice looked out through the door and saw Officers William Gordon and Sylvester J. Rotering, who had come to the high school after their supervisor had been alerted by the welding instructor that someone was removing a torch from the welding shop. The accomplice, whoever he was, stepped back in the office and shouted, "Don't come in. I've got a rod." The two men sought to escape by a window and found that police officers were outside so they made a dash through the door, the accomplice carrying a revolver and shooting as he ran. Cozart had no gun and he was shot down in the exchange of bullets and was captured. Officer Rotering was likewise wounded, and the accomplice escaped. He was seen outside the building by a deputy sheriff, who fired a couple of shots at him but missed.

On the body of Cozart there was found an address book containing the names, addresses, and telephone numbers of 55 people, both men and women. On one page was found the name of Irv Jones, Route 4, Mankato, telephone number 507-345-5863. This turned out to be the name, address, and telephone number of defendant.

Defendant had been convicted of a crime some 20 years earlier while he was a young man, and spent some time in the reformatory. He and Cozart apparently had a mutual friend by the name of Kranz, whose name and telephone number also appear in the address book. Aside from this connection, there is no showing as to how defendant's name happened to be in the book. An investigation was made by the Bureau of Criminal Apprehension and Officers Gordon and Rotering testified that they identified defendant from a picture shown to them as the man who had shot at them, and that they later went to Mankato, where they identified defendant as the accomplice of Cozart in the burglary.

Defendant operates a welding shop near Mankato. So far as the record shows, aside from the trouble with the law when he was a youth, he has been in no trouble. He is married and has three children and lives with his wife and family about 5 miles from the city of Mankato.

Defendant was convicted by a jury. On appeal he assigns a number of errors, but they are so interrelated with his claim of misconduct on the part of the prosecuting attorney that each will be discussed with the claim of misconduct. Essentially, the thrust of the appeal is that defendant did

not have a fair trial. We agree with him. There are so many separate items of impropriety in the trial that it is impracticable to discuss them all, but we will discuss those that seem to us to be the most important.

1. The first and probably one of the most important claims of defendant is that the address book, exhibit 23, should not have been admitted into evidence without some further foundation showing how defendant's name happened to be in it. Cozart was called by the prosecution and testified in detail as to how the burglary was committed. When he was asked how defendant's name happened to be in the book, the following transpired:

"Q. Mr. Cozart, under what circumstances was the second entry made on the page marked 'J?'

"A. I decline to answer.

"The Court: Does the witness decline to answer on the grounds that he does not know?

"The Witness: I decline to answer because I don't remember.

"The Court: Are you saying you don't remember and would that be the same as you do not know? I am trying to determine for the record whether you are not answering because you don't know or just because you decline to answer but do know. I want to clarify the record.

"The Witness: I just decline to answer it, that's all.

"The Court: You decline to comment on whether you do or don't know?

"The Witness: That's right."

The above came after the court had twice sustained objections to the book on the ground there was no foundation for its admission.

Without further foundation, it is our opinion that the book was inadmissible. The court should have compelled the witness to answer if the prosecution was going to ask these questions at all. There would be no immunity available to Cozart as grounds for refusing to answer these questions. He had already entered a plea of guilty, and even though sentence had been deferred, his plea, together with his testimony as to the manner in which the burglary was committed, would be a complete waiver of immunity with respect to these questions. Under the circumstances, and with the foundation laid, the book was nothing but hearsay as to

the defendant, but from the way the matter was left, the jury could infer that, merely because his name appeared in the book, he was the accomplice of Cozart. No explanation is made of the more than four dozen other names in the book, or how they happened to be there. Cozart was a professional burglar and it is as likely that he had in his address book names of persons to whom he could go for refuge or places he could burglarize as names of persons who would join him in crime.

■ Outside of the use of this address book, the conviction rests mainly on the identification by Officers Gordon and Rotering. They testified that they were shown photographs of defendant and others and picked him out as the man whom they saw in the doorway. Cozart testified that when they heard a noise out in the hall his accomplice peeked through the door enough to see the two officers. The officers testified that the door was wide open and that defendant stood in the open doorway from 5 to 10 seconds while they looked at him. Cozart was the state's witness. The testimony of Rotering at the trial varied from his testimony at the preliminary hearing prior to trial. In the preliminary hearing he said the man he saw was tall, heavy-set, and elderly, and that he was wearing a winter cap and a three-quarter-length gray car coat, light-colored trousers, and gloves. At the trial he said the man he saw was large, heavy-set, wearing dark clothing and a gray, fuzzy winter hat. Defendant argues, with some logic, that Rotering changed his testimony at the trial in order that it could be consistent with that of Gordon. Cozart's testimony that the man—a burglar caught in the process of committing a burglary—peeked out through the door without opening it wide would be more logical. While we have hesitated to reverse convictions based on positive identification, so much prejudice was injected into this trial that the jury's confidence in such identification may have been misplaced.

■ With respect to the extrajudicial identification by the officers from the pictures, about all that need be said is that we think it would be admissible if a proper foundation was laid. See, Annotation, 71 A. L. R. (2d) 449, 462; People v. Cook, 33 Ill. (2d) 363, 211 N. E. (2d) 374; People v. Gould, 54 Cal. (2d) 621, 7 Cal. Rptr. 273, 354 P. (2d) 865.

■ We come then to the numerous assignments of misconduct of the prosecuting attorney which are interwoven with other claims of inadmis-

sibility of evidence. With respect to the use of the address book, exhibit 23, the prosecutor said to the jury:

"* * * Now, we come to a little green book. A little green book! It's admitted into evidence finally. Finally admitted into evidence. Taken from Cozart's person. Preserved. The name 'Erv Jones' is in the book. It came in after how many objections? I object. I object. And then when Jones finally took the stand to tell about the little green book, what does he say? Oh, I don't know Cozart. Never heard of him. Don't have any idea. Called a buddy in Chicago to see whether he knew anything about this thing—about this buddy of mine when we were in prison. We served a stretch together and we have been in contact ever since and maybe he knows something about this. Maybe this buddy in Chicago who was in prison with him would know something about Cozart, who is a burglar. And be able to tell him how the name appeared in this book, but Jones says he doesn't know anything about it, see. If this is the case and it was all this innocence, why did they object to this book for so long? Again I leave this to your good judgment to answer."

It is completely unfair for the prosecution to use in this manner the objection of a defendant to the admission of evidence he thinks inadmissible. Such argument can be for only one purpose, and that is to implant in the minds of the jury the feeling that defendant, by objecting, is seeking to keep out some incriminating evidence. Defendant has the right to object to evidence without being subjected to such improper argument.

■ The state called William Cozart as its witness. He had already entered a plea of guilty to the crime for which defendant was being tried. The imposition of sentence had been stayed a period of 2 years. He testified in detail as to his participation in the burglary and how it was conducted. The following then transpired:

"[By county attorney] Q. Mr. Cozart, do you know the defendant in this case?

"A. Decline to answer.

"Q. Was the defendant in this case with you the night of June or the

night of January 6, 7, when you committed the burglary at the high school in the city of Winona?

"A. I decline to answer.

"Q. Mr. Cozart, do you deny that Mr. Jones was the person who was with you on the night of January 6, 7?

"A. I decline to answer.

"Q. You decline to answer?

"A. Yes."

Cozart was called as a rebuttal witness, when he was again asked these questions:

"Q. There was some testimony with reference to the name Kranz. Referring to the address book, State's Exhibit No. 23, does that name Kranz appear on the page marked K?

"A. Yes.

"Q. And there is a telephone number there, is there not?

"A. Yes.

"Q. Mr. Cozart, I ask you whether you do in fact know a man by the name of Kranz?

"A. Yes.

"Q. And what is his first name?

"A. Blaine Kranz.

"Q. Do you work with him sometimes?

"A. I drove cab with him a couple of times, yes.

\* \* \* \* \*

"Q. Mr. Cozart, was Blaine Kranz with you on the night you committed the burglary at the Senior High School in Winona, on January 6, 7, of 1965?

"A. No.

"Q. I will ask you again. Will you now wish to state whether Jones here at the end of the table was with you on the night that you committed the burglary at the Senior High School in Winona on January 6, 7, 1965?

"A. Decline to answer."

It must be assumed that the state was fully aware of the answers it would receive to these questions, because Cozart had taken the same po-

sition at his arraignment and when questioned in the hospital shortly after the burglary.

Defendant contends it was a violation of due process to permit these questions to be asked knowing what the answers would be, in that they were intended only for the purpose of creating prejudice in the minds of the jury and leaving the inference that failure to answer established the guilt of defendant. Defendant seeks to equate this action with that of the state's calling a codefendant, knowing that he is going to refuse to answer under the Fifth Amendment. This subject was quite thoroughly explored in State v. Mitchell, 268 Minn. 513, 130 N. W. (2d) 128, certiorari denied, 380 U. S. 984, 85 S. Ct. 1351, 14 L. ed. (2d) 276. We there indicated support for the rule that calling a codefendant, knowing he is going to take the Fifth Amendment, is improper and prejudicial. However, the violation of this rule is not always ground for a new trial. The question is annotated in 86 A. L. R. (2d) 1443. It seems that most of the cases that have considered the question follow the rule that a cautionary instruction by the court will usually eliminate the prejudice caused by improperly asking the question. The difficulties inherent in asking or not asking such questions are pointed out in the case of United States v. Maloney (2 Cir.) 262 F. (2d) 535. The court indicated there that if a codefendant is called and asserts his privilege under the Fifth Amendment to refuse to testify an inference is bound to arise as to what his answer would have been if he had not refused. If, however, he is not called, the inference can easily arise that if he had been called his testimony would have been adverse to the state. It is therefore almost impossible to lay down a general rule that will apply to all cases.

While the witness in this case did not assert the Fifth Amendment as grounds for refusal to answer the questions, the effect of his refusal to answer the questions put to him was even more devastating than if he had refused to testify at all. Having entered a plea of guilty to the crime prior to trial, and having testified in detail to his participation in it, he clearly had waived immunity. See, United States v. Romero (2 Cir.) 249 F. (2d) 371. The state could not be criticized for calling Cozart to testify to the facts concerning the manner in which the burglary was committed or his participation in it. However, after the answers con-

cerning defendant's connection with the burglary were made, the least that could be expected would be that the court would give a cautionary instruction to the jury that no inference could be drawn against the defendant as a result of Cozart's failure to answer these questions. If an inference may not be drawn when a codefendant refuses to answer at all, there is even more reason for a cautionary instruction where, as here, he answers everything except the crucial question. The state should have taken some steps to compel Cozart to answer. It is not enough to say the defendant could likewise have taken these steps. The harm was committed by the state and it was up to the state to correct it as far as this could be done.

But that is not the worst of it. The main vice of the whole matter is the way the answers were handled by the state's prosecutor in his argument to the jury. Among other things he there said, in discussing Cozart:

"* * * He [Cozart] goes through the whole works. How they got in. What they did. Who was doing it. The defendant was doing it. Cozart doesn't say this. The other man he says was leading, was opening doors and getting the torch and he was in charge — this other man. He will say everything. He will tell us all, except one thing. Now, can it be said that this man is assisting the prosecution? Hardly! Hardly! He will tell what he did but the assistance of the prosecution, of course, needs a statement from Cozart that this was the man. If he is going to help us, this is what we want, you know, and we can't get it. He is simply not going to say who the other man was. He will tell everything else and you recall when he was on that stand and he was asked about the notebook; how did the name appear in the notebook? Refused to answer! Then he was asked the question: Was this defendant the man who was with you on the night in question? He says, 'I decline to answer.' Didn't he? He not only says, 'I decline to answer,' whether he was the person that was with him but he said, 'I will not even read the defendant's name from a notebook.' * * * He won't say it was the defendant. *But he won't do something else. He also won't deny that it was the defendant.* * * * I don't know what it was that made him refuse to answer. I don't know. I will leave that to you. He is asked this question. Now, is it because of a personal belief on Cozart's part—a personal philosophy that it's all right to rob

and steal or at least to steal—it's all right to break in and take somebody else's money, but it's not all right to squeal on a buddy? Is this his only personal philosophy that makes him behave this way? Twisted, sure. Or is it something else? Is there a code? Is there a code among people who commit these crimes, that regardless of what you may want to do, you just don't ever squeal? You just don't? That is for you people to decide." (Italics supplied.)

Much more could be recited from the argument of counsel but we think the above is enough to show that the prosecution did everything it could to implant prejudice in the minds of the jury by leaving with them the feeling that Cozart's failure to testify pointed to defendant's guilt.

We have frequently held that it is the duty of the trial court and the prosecution to see that a defendant gets a fair trial. The type of argument used destroys any semblance of a fair trial.

■ Defendant called as a witness Alfred Oachs, a farmer living in the vicinity of Mankato. He testified that on January 6, the night when this crime was committed, he was at defendant's place of business from 8 o'clock in the evening until 11 and that Jones did some work on his car during that time, after which they had coffee at defendant's home. Oachs had a receipt showing payment for the work, which he received from defendant, bearing the date of January 6.

Of course, had the jury accepted Mr. Oachs' testimony it would have had to conclude that defendant could not have been a participant in this crime. He could not get from Mankato to Winona in the time elapsing between his separation from Oachs and the commission of the crime. In order to break down Oachs' testimony, the state recalled him as a rebuttal witness. The following questions were then asked:

"Q. * * * Do you know a man by the name of Max Stacey?

"A. Yes.

"Q. And who is Max Stacey?

"A. Who is he?

"Q. Yes. Is he any relation to you?

"A. Well, not by that name, no.

"Q. Well, is the man himself?

"A. Yes.

"Q. Any relation to you?

"A. Yes.

"Q. What relation is he of yourself?

"A. He is a brother.

"Q. A full brother?

"A. That's right.

"Q. And you say not by that name?

"A. Well,—

"Q. You say he has another name?

"A. Yes.

"Q. What is his other name?

"A. Cordial Oachs.

"Q. Cordial Oachs?

"A. Yes.

"Q. Mr. Oachs, was your brother, Max Stacey, also known as Cordial Oachs, in prison with Erwin Jones?

"A. I couldn't swear to it. I believe, but I couldn't swear to it. I was pretty young at that time."

In arguing to the jury the prosecution handled the question of alibi in the following way:

"* * * And then what did the defense do? Well, they brought out a fellow to give an alibi. We call it an alibi. 'Where were you on such and such a night? I was there and I can prove it.' Alibi witnesses! Now, an alibi witness is a kind of a difficult thing to handle, you know, because he can say he was someplace and who can say he wasn't. So there are three ways that defendants obtain alibi witnesses or develop the defense of alibi. One: They do this before the crime is committed. They set up a situation in advance, such as the giving of a receipt with an erroneous date on it to a customer, which they then later on go back and use. This is one way, set the alibi up in advance before you commit the crime. The second way, is to set up the alibi after you commit the crime. Go to some fellow that you have talked with a while ago and said [sic], 'Joe, you

remember that night that I was out to your place and we sat in your kitchen and had coffee.

" 'Yes.

" 'Well, that was on such and such a night, wasn't it, as I recall?

" 'Well, yes. Yes, I think it was.

" 'Well, it's kind of important to me, Joe; do you remember for sure whether it was?

" 'As I recall, it was.' All of a sudden, the fellow is committed to, 'Yes, it was that night.' And then when a person makes up his mind, you aren't going to shake him so that's that in setting up an alibi to a crime.

"The third way is, *you go out and buy yourself a liar. You just go out and buy yourself a liar.* Now, how are you going to be able to find out about this, whether this alibi witness is a liar? How is the prosecution going to develop, you know, that the man wasn't there? There aren't too many people who saw them together or saw the man someplace else and it's awfully hard to prove that kind of a lie, but that's the way it is done. Well, now, we don't like to call somebody a liar, do we? You don't. I don't. And you kind [of] wonder. But we have got Alfred Oachs who comes in here and first of all, 'Yes,' he says, 'I had the receipt and I have had the work done and so forth,' and you kind of wonder, and then you begin to check. What reason might there be for this man to be available to Jones? Why is this man available? Why is he helping? Well, one of the things is that the defense alibi witness, *Alfred Oachs, had a brother known under a couple different names, a Max Stacey and Cordial Oachs who was in prison.* The witness said he thought it might be possible his brother was in prison with the defendant, Erwin Jones. Now, is there some kind of a brotherhood that works, you know, after you serve some time and you get out, with some of these people who don't straighten out? Is there a brotherhood that works and—'You help me,' and 'I will help you?' Maybe Oachs was a liar. Maybe he was a darn liar. He had some reasons to be." (Italics supplied.)

There is nothing in the record to even suggest that Oachs was anything but a hardworking farmer. Certainly there is nothing that could impute to him the status of liar. Further, we know of no rule of law under which the credibility of a witness can be impeached by showing that a

relative has committed a crime. Were that to become the law a great many people would be in jeopardy. We think the questions asked regarding Mr. Oachs' brother were highly improper and the argument even more so.

■ Defendant called a number of character witnesses. So far as the record shows, they were all reputable citizens. The prosecutor, in order to offset the effect of their testimony, asked one after the other this question: "Have you ever been asked to vouch for his character before?" to which the answer was, "Yes, I have." That was as far as it went. There was no indication that the witnesses had been asked to vouch for defendant's reputation in a criminal case or for what reason. It left the impression that defendant had been involved in numerous affairs requiring character witnesses.

■ With respect to the commission of the crime, it is admitted by Officers Gordon and Rotering that when the men ran out of the superintendent's room the one with the gun was shooting with his left hand. There is nothing in the record to contradict the testimony of defendant's witnesses that defendant was right-handed. The prosecutor, in his argument to the jury, handled this as follows:

"* * * A handgun isn't hard to shoot with a left hand. All you have to do is pull the gun up and pull the trigger and keep on going. He doesn't hear anybody on this side, but behind him he hears shooting. He is shooting behind and he is still going full tilt. He is shooting around behind him while he is going up the ramp just in case he can hit somebody or at least to get him down and distract him. Off he goes with a couple more shots. Sure if it was a shotgun or a rifle, it might be a little bit different. *It may be a little awkward to handle a rifle or shotgun with either hand but this isn't true with a handgun. We know this from television by the old timers when they were in spots like this.*"[1] (Italics supplied.)

We have frequently held that a prosecutor has no right to inject his own personality into a case or his own opinion about the guilt or innocence of the defendant. See State v. Gulbrandsen, 238 Minn. 508, 57

---

[1] It seems to us that if television is to be brought into the trial of criminal cases we should remember that the officer in the television shows always gets his man. That was far from true here.

N. W. (2d) 419, where many of our cases are collected. See, also, State v. Cole, 240 Minn. 52, 59 N. W. (2d) 919; State v. Schwartz, 266 Minn. 104, 122 N. W. (2d )769. In his argument the prosecutor said:

"* * * You kind of have the feeling that if your investigation shows clearly that this crime has been committed and this person [referring to defendant] is involved, you think, 'Well, they are all in a pack and they are all against us.' "

In winding up his argument to the jury, the prosecuting attorney said:

"* * * When we talked about your sitting on this case, you remember we made a little pact, each one you and I that if the evidence in the case proved the guilt of the defendant, that the responsibility of a juror would be to convict. This is the responsibility of a juror. This is the only way that crimes can be controlled, for the protection of the public. The way to stop crime is to convict the persons who commit them and this is the responsibility of the jury. *In this case, the evidence is in and the evidence clearly shows the guilt of this defendant beyond a reasonable doubt on both burglary and aggravated assault."* (Italics supplied.)

While this statement taken in the abstract doesn't sound too bad, it must be mentioned that the prosecution and jury have no pact of any kind. The jury enters into no pact with the prosecution to convict, or with the defense to acquit. The duty of the prosecutor is to present the case fairly and argue it fairly. He may do so forcefully, but as we said in State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630, it is the duty of the prosecuting attorney as well as the court to see that the accused has a fair trial. We there cited with approval Berger v. United States, 295 U. S. 78, 88, 55 S. Ct. 629, 633, 79 L. ed. 1314, 1321, where Mr. Justice Sutherland, speaking for the court, said:

"* * * [H]e [the prosecuting attorney] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

In this case we find too many foul blows to permit the conviction to stand.

■ At the close of the trial and as a rebuttal, the state called one William Bennyhoff. It was shown that he was a crime investigator for the State of Minnesota and had been so employed for 20½ years. He was then asked whether he had been called upon to make an investigation of the Winona school burglary. He stated that he had, and that he had examined Mr. Cozart's effects and found the little green address book and in it the name of Irv Jones, Route 4, Mankato, and a telephone number. He was then asked, "Did you recognize that name?" and answered, "I did, yes." The matter was dropped there. Obviously this was intended for only one purpose. Defendant had apparently been charged with another crime some years before and had been tried and acquitted. The question could have been intended only for the purpose of leaving with the jury the innuendo that this crime investigator was familiar with defendant and that therefore defendant was a man of bad character. The charge and acquittal of defendant for another crime could not be shown directly. Neither do we think it should be permitted to be shown in this manner, indirectly. We think the question was entirely improper and it was prejudicial.

■ Defendant claims that the court erred in failing to instruct the jury that Cozart was an accomplice as a matter of law and that his testimony required corroboration. No request was made for such instruction and, while certainly it should have been given, we have held, in State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155, and State v. Guy, 259 Minn. 67, 105 N. W. (2d) 892, that failure to give such instruction in the absence of a request is not reversible error.

It is evident that defendant was deprived of a fair trial.

Reversed and new trial granted.

Mr. Justice Sheran took no part in the consideration or decision of this case.