STATE of Minnesota, Appellant,

v.

Angel MORALES, Respondent.

No. A07–2401.

Supreme Court of Minnesota.

Sept. 23, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for appellant.

David W. Merchant, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

A Hennepin County jury found Angel Morales guilty of second-degree felony murder for the death of Victor Mesa–Ortiz during the commission of an aggravated robbery. The Hennepin County District Court convicted Morales of this crime and sentenced him to 150 months in prison. At trial, the State alleged that Morales's accomplice, Felipe Vega–Lara, shot and killed Mesa–Ortiz when Mesa–Ortiz resisted an attempt to rob him at gunpoint. The district court granted Vega–Lara use immunity, and the State called Vega–Lara to testify at Morales's trial even though Vega–Lara indicated that he planned to assert a Fifth Amendment privilege. Over Morales's objections, the court allowed the State to question Vega–Lara about the testimony Vega–Lara had provided at his own trial. The court also allowed the State to introduce out-of-court statements by Vega–Lara under the statement-against-interest exception to the hearsay rule.

Morales appealed his conviction, and the court of appeals held that the district court abused its discretion in (1) allowing the State to question Vega–Lara after he had asserted a Fifth Amendment privilege; (2) allowing the State to impeach Vega–Lara with his prior inconsistent statements; and

(3) admitting some of Vega–Lara's out-of-court statements as statements against penal interest. After concluding that the errors were not harmless, the court of appeals reversed. We affirm the court of appeals in part and reverse in part.

Victor Mesa–Ortiz was killed on March 13, 2006, while working at a house of prostitution in South Minneapolis. The owner of the house operated the prostitution business, and Mesa–Ortiz was in charge of collecting money from customers and paying the prostitutes at the end of each week. On the day of Mesa–Ortiz's murder, C.M. and M.R., two prostitutes who worked at the house, and M.F., a man who lived there, were at the house with Mesa–Ortiz. That evening, three young men, including Felipe Vega–Lara and Tarun Solorzano–O'Brien, came to the house. The State alleges that the third man, who wore a brown hat with a brim, was the respondent, Angel Morales. After investigating Mesa–Ortiz's murder, the police arrested Vega–Lara and Morales. A Hennepin County grand jury indicted both Vega–Lara and Morales for first-degree felony murder in violation of Minn.Stat. §§ 609.185(a)(3) (2008) and 609.05 (2008). The trials were severed, and the State tried Vega–Lara first. *See* Minn.Stat. § 631.035, subd. 2 (2008); Minn. R.Crim. P. 17.03, subd. 2(1).

*Vega–Lara's Trial*

At Vega–Lara's trial, Vega–Lara testified about the robbery and murder. In his testimony, Vega–Lara implicated Morales as follows. On the evening of March 13, 2006, Vega–Lara, Solorzano–O'Brien, and Morales went to the house of prostitution in South Minneapolis. Vega–Lara claimed Morales wanted to rob the house of prostitution and had previously "thought up the mission." Both Vega–Lara and Morales carried loaded guns when they entered the house. Morales sat on a couch in the corner of the living room while Vega–Lara and Solorzano–O'Brien spoke with Mesa–Ortiz. Vega–Lara paid Mesa–Ortiz money so that he and Solorzano–O'Brien could have sex with C.M. and M.R. Solorzano–O'Brien went into a bedroom with M.R., and Vega–Lara went into another bedroom with C.M.

After a period of time, Vega–Lara left the bedroom. Vega–Lara claimed that he then saw Morales attempting to rob Mesa–Ortiz at gun point, but Mesa–Ortiz resisted. As Mesa–Ortiz and Morales struggled over Morales's gun, Vega–Lara shot Mesa–Ortiz. Vega–Lara testified that he did not go to the house with the intent to kill Mesa–Ortiz.

The jury acquitted Vega–Lara of first-degree murder, but found him guilty of unintentional second-degree felony murder during the commission of an assault. The district court convicted him of that crime. Vega–Lara subsequently appealed his conviction to the court of appeals.

*Morales's Trial*

While Vega–Lara's appeal was pending, the State tried Morales for first-degree murder, Minn.Stat. § 609.185(a)(3), and three lesser-included offenses: intentional second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2008); unintentional second-degree felony murder during the commission of an assault, Minn.Stat. § 609.19, subd. 2(1) (2008); and unintentional second-degree felony murder during an aggravated robbery, § 609.19, subd. 2(1). During Morales's trial, the State filed a motion under Minn.Stat. § 609.09 (2008), seeking to compel Vega–Lara—who was claiming a Fifth Amendment privilege—to testify under a grant of immunity.

Vega–Lara challenged the State's motion to compel him to testify. Vega–Lara claimed he could assert a valid Fifth Amendment privilege regardless of a grant

of immunity because he had a legitimate "fear of a perjury prosecution arising out of a conflict between what he said in his own trial and what he may say at this trial." The district court acknowledged that even with use immunity, Vega–Lara would be subject to a perjury prosecution if he lied at Morales's trial. Nonetheless, the court granted the State's motion to compel Vega–Lara to testify, explaining that if Vega–Lara was successful on his appeal and was retried, nothing that Vega–Lara said at Morales's trial could be used against him at the retrial. The court further explained that the State would be able to use Vega–Lara's testimony against him in a prosecution for perjury "only if [Vega–Lara] were to make a false statement under oath."

At trial, the State called C.M., M.R., and M.F. to testify. Each witness testified that three men came to the house on March 13, 2006, and identified Vega–Lara and Solorzano–O'Brien as two of the three men who were present in the house when Mesa–Ortiz was killed. C.M. and M.R. described Vega–Lara as being very nervous, aggressive, bossy, and having a "strange" attitude. C.M. and M.R. described the third man as quiet, young, and wearing a hat low on his head. Neither C.M., M.R., nor M.F. identified Morales as the third man.[1]

M.F. testified that after the three men arrived at the house, he left the kitchen where he had been preparing food to go to a grocery store. C.M. testified that she went into a bedroom with Vega–Lara and had sex for approximately five minutes, after which Vega–Lara asked to have sex again. C.M. told Vega–Lara he would have to pay again, and he then left the

bedroom. At that time, C.M. noticed the third man was still sitting in the living room, but had moved to a different seat. C.M. also testified that shortly after Vega–Lara left the bedroom, she heard "people struggling" in the dining room, and then "after awhile" she heard a gunshot. She then heard people "running, like people getting out." Similarly, M.R. testified that she heard struggling and a gunshot while she was in the bedroom with Solorzano–O'Brien. After the gunshot, Solorzano–O'Brien ran out of the bedroom and M.R. hid in a closet. When C.M. and M.R. emerged from their respective bedrooms some time later, they did not see anyone else in the house. Because C.M. and M.R. did not witness the shooting, they did not know who shot Mesa–Ortiz or if the third man was involved in the shooting.

M.F. testified that when he returned to the house, another man had arrived at the house and discovered Mesa–Ortiz lying face down in the backyard. After trying to revive Mesa–Ortiz, M.F. and the other man put Mesa–Ortiz in a car and attempted to take him to a hospital. When they could not locate a hospital, they stopped and called the police. Police officers testified that when they arrived at the car, Mesa–Ortiz was dead and the front pockets of Mesa–Ortiz's pants were pulled out. An autopsy revealed that a gunshot wound to the chest caused Mesa–Ortiz's death, and a forensic specialist determined that Mesa–Ortiz's death was a homicide.

Several police officers testified about their subsequent investigation into the murder. The officers stated that they discovered a latent fingerprint on a glass in the house of prostitution that matched one of Vega–Lara's fingerprints. From there,

---

1. In an earlier interview with the police, M.R. explained that she could not give much of a description of the third man because she did not really focus on him. She also stated that she could not remember the color of the man's hat "because when that one arrived he just sat down."

police officers interviewed associates of Vega–Lara, including M.G. One officer explained that Morales became a suspect when M.G. confirmed that Vega–Lara was involved in Mesa–Ortiz's death and informed officers that Morales and Solorzano–O'Brien were also involved.

When it came time for Vega–Lara to testify, Vega–Lara stated—out of the presence of the jury and without the assistance of counsel—that despite his use immunity, he would not testify at Morales's trial.[2] The State argued that it was entitled to call Vega–Lara to ask him certain questions. Morales argued that it was unfairly prejudicial for the State to call Vega–Lara "solely for the purpose of having the jury see him, an alleged co-conspirator of the defendant, invoke a [F]ifth [A]mendment privilege or refuse to testify before this jury." Nevertheless, the court ruled that the State had the right to question Vega–Lara because he had been granted use immunity.

The State then called Vega–Lara to testify and questioned him about the robbery and murder of Mesa–Ortiz. Vega–Lara did not give a substantive answer to any of the State's questions. For the most part, he responded to each question with the statement, "I refuse to answer," but his first response was, "I plead the fifth. Refuse to answer." Later, Vega–Lara simply responded, "Plead the fifth," and the State responded, "You have been granted immunity, sir." Vega–Lara then said, "Okay. I refuse to answer."

As Vega–Lara refused to answer questions, the State responded to Vega–Lara's refusal to answer by introducing questions posed to and answers given by Vega–Lara at his own trial. Morales repeatedly objected to the use of the questions and

answers arguing that they included hearsay, but the district court overruled the objections and allowed the introduction of the questions and answers as prior inconsistent statements. More specifically, the State introduced into evidence prior statements regarding Vega–Lara's relationship with Morales and the events of March 13, 2006. In essence, a detailed description of Vega–Lara's testimony at his own trial was introduced. An example of the direct examination is as follows:

> State: Did you—did Angel Morales point the gun at Victor Mesa–Ortiz for the purpose of robbing him?
>
> Vega–Lara: Refuse to answer.
>
> State: Did you previously testify that he pointed the gun at Victor Mesa–Ortiz—
>
> Vega–Lara: Refuse to answer.
>
> State: —for the purpose of robbing him?
>
> Vega–Lara: Refuse to answer.
>
> State: Did Victor Mesa–Ortiz resist when Angel Morales pointed the gun at him and tried to rob him?
>
> Vega–Lara: Refuse to answer.
>
> State: At that point did you enter the—did you previously tell the jury that Victor Mesa–Ortiz started struggling with Angel Morales over the gun?
>
> Vega–Lara: I refuse to answer.

On cross-examination by Morales's counsel, Vega–Lara also refused to answer questions. Vega–Lara gave a substantive response to only one question, admitting that he testified at his own trial that he did not intend to kill Mesa–Ortiz. The district court instructed the jury that Vega–Lara's prior testimony was "admitted only for the light it may cast on the truth of Mr. Vega–

---

**2.** The district court stated that it preferred to have Vega–Lara's counsel present, but when Vega–Lara stated he did not need to consult with his counsel any further, the court allowed the State to call Vega–Lara even though his counsel was not present.

Lara's testimony at this trial" and also told the jury, "You must not consider the statement as evidence of the facts referred to in the statement."

Through the testimony of M.G., the State introduced into evidence out-of-court statements of both Morales and Vega–Lara. M.G. testified that he had a conversation with Morales before the murder in which Morales declared he had plans to rob the house of prostitution.[3]

M.G. also testified about a conversation he allegedly had with Vega–Lara after the murder. Before trial, the State conceded that the parts of Vega–Lara's statements to M.G. that mentioned Morales did not fall within the statement-against-interest exception to the hearsay rule. The State agreed to excise or redact the statement and advised M.G. not to reference Morales when recounting Vega–Lara's statements to the jury. Under this agreement, the district court admitted Vega–Lara's statements as statements against his penal interest. *See* Minn. R. Evid. 804(b)(3). M.G. was then allowed to testify that Vega–Lara told him that Vega–Lara, Solorzano–O'Brien, and "another person" went to the house to commit a robbery and that Vega–Lara had stated that "another person" was struggling with Mesa–Ortiz when he shot Mesa–Ortiz.

Morales attacked M.G.'s story on cross-examination, pointing out that M.G. initial-ly told the police that Morales had spoken to him two days after the murder, rather than before the murder. Morales pointed out the lack of evidence regarding Morales's presence at the house on the day of the murder, asserting that M.G.'s testimony was the only thing that linked Morales to the crime. Morales also alleged that Vega–Lara shot Mesa–Ortiz because of a disagreement he had with Mesa–Ortiz regarding whether he had to pay more for additional sex with C.M.

Near the end of Morales's trial, the State moved the district court to admit a transcript of Vega–Lara's prior testimony and requested that the transcript be admitted as substantive evidence under Minn. R. Evid. 801(d)(1)(A)—prior inconsistent statements as nonhearsay—or under Minn. R. Evid. 807—the residual hearsay exception. The court denied that motion and did not admit the transcript.

It is undisputed that the State violated the parties' substitution agreement in its closing argument when it used "Morales" or "the defendant" rather than "another person" more than once when describing M.G.'s testimony regarding Vega–Lara's statements. For example, the State said, "Vega–Lara told M.G. that when the robbery began Victor resisted, and the defendant and Victor Mesa–Ortiz got into a struggle over the defendant's gun." [4]

---

**3.** M.G.'s testimony regarding his conversation with Morales was as follows:

> State: [P]rior to March 13th of 2006, did you have a conversation with Angel Morales about plans that he had?
> M.G.: Yes.
> State: And can you tell the jury what he told you?
> M.G.: Pretty much, you know, about the robbery, the location was a whorehouse. Objectives were money and a gun.
> State: And did he say where the whorehouse was located?
> M.G.: Somewhere on Cedar.

> State: On Cedar.
> M.G.: Yeah.
> State: Okay. And did he say whether he or someone else had scouted it out ahead of time?
> M.G.: Yes.
> State: And what did he tell you about that?
> M.G.: Um, I don't remember that much but yeah, he told me something, you know, that he checked it out with some other guys, yes.

**4.** The State made other statements connecting the phrase "another person" with Morales.

The jury acquitted Morales of first-degree murder, intentional second-degree murder, and second-degree murder during the commission of an assault. But the jury found Morales guilty of unintentional second-degree felony murder during an aggravated robbery. The district court convicted Morales of that offense and sentenced him to 150 months in prison.

*Court of Appeals' Decision*

On appeal to the court of appeals, Morales challenged the district court's decision to allow the State to call Vega–Lara even though Vega–Lara indicated that he would refuse to testify. Morales also challenged the district court's decision to permit the impeachment of Vega–Lara's refusals to answer questions and the court's admission of Vega–Lara's out-of-court statements to M.G.

The court of appeals concluded that the State's questioning—specifically the detailed references to Vega–Lara's prior testimony—violated the rule applied by federal circuit courts and articulated but not necessarily endorsed by the United States Supreme Court in *Namet v. United States,* 373 U.S. 179, 186–88, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). *State v. Morales,* 764 N.W.2d 621, 628 (Minn.App.2009). The court reached this conclusion because it believed the questioning added "critical weight" to the State's case and did so in a manner not subject to cross-examination. *Id.* at 629. The court of appeals also cited *State v. Mitchell,* 268 Minn. 513, 517, 130 N.W.2d 128, 131 (1964), in making this conclusion. *Morales,* 764 N.W.2d at 628. The court did not reach the issue of whether the State called Vega–Lara as a witness in bad faith, which would have also been a violation of *Namet. Morales,* 764 N.W.2d at 629. The Court of Appeals also held that the district court erred in admitting some of Vega–Lara's statements to M.G. because the statements were not against Vega–Lara's penal interest. *Id.* at 627. Concluding that the cumulative effect of the district court's errors was not harmless, the court of appeals reversed Morales's conviction and remanded for a new trial. *Id.* at 629–30.

We granted the State's petition for review. There are two questions to be reviewed on appeal. First, whether the district court erred when it allowed the State to call Vega–Lara as a witness and then attempt to impeach him with statements he made at his own trial concerning the crime. Second, whether the court erred when it admitted Vega–Lara's prior out-of-court statements to M.G. as statements against interest.

I.

The State asserts that the district court did not abuse its discretion when it allowed the State to call Vega–Lara as a witness or when it allowed the State to use Vega–

---

The district court sustained one objection regarding these statements:

State: M.G. told you that he had seen the defendant with a gun before and he told you that Vega–Lara said the defendant had a gun on March 13, 2006.

State: M.G. told you that when Felipe Vega–Lara left the bedroom he saw the defendant walking towards his target with his gun drawn.

Morales's Counsel: Objection, Your Honor. Misstates the evidence and the court's prior rulings.

Court: Sustained, the jury will disregard that last statement.

State: Vega–Lara told M.G. that when the robbery began Victor resisted, and the defendant and Victor Mesa–Ortiz got into a struggle over the defendant's gun.

Morales's Counsel: Same objection, Your Honor.

Court: That one is overruled. I think that's what Mr. Vega–Lara said.

Lara's prior testimony from his own trial in an attempt to impeach him. The State makes two arguments in support of its assertion: first, that Vega–Lara did not have a valid Fifth Amendment privilege, and, second, that the holdings in *Mitchell* and *Namet* do not apply to situations where a witness claims an invalid privilege.[5]

Morales makes four arguments in response to the State's arguments: (1) Vega–Lara had a valid Fifth Amendment privilege; (2) regardless of whether Vega–Lara's Fifth Amendment privilege was valid, the district court erred in allowing the State to call a witness who indicated he would refuse to testify; (3) the State's questioning of Vega–Lara was unfairly prejudicial under the holdings announced in *Mitchell* and *Namet;* and (4) the State's attempt to impeach Vega–Lara was improper because Vega–Lara's refusals to answer questions were not actually inconsistent with his prior testimony.

### A. Fifth Amendment Privilege

 We first address the question of whether Vega–Lara continued to have a Fifth Amendment privilege against testifying at Morales's trial once the district court granted him use immunity. In *Johnson v. Fabian,* we stated that "[t]he Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that no person 'shall be compelled in any criminal case to be [a] witness against himself.'" 735 N.W.2d 295, 299 (Minn. 2007) (quoting U.S. Const. amend. V); *see also* Minn. Const. art. I, § 7. The Fifth Amendment protects a person from being a witness against himself by "privileg[ing] him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers

might incriminate him in future criminal proceedings." *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). In *Marchetti v. United States,* the Supreme Court explained that "[t]he central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *see also Hiibel v. Sixth Judicial Dist. Court of Nev.,* 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004).

Immunity statutes allow the State to question an individual who would otherwise have a Fifth Amendment right against self-incrimination. Minnesota's use-immunity statute allows a district court to order a witness to testify, but prohibits the State from using any of the compelled testimony against the witness in most criminal prosecutions. Minn.Stat. § 609.09, subd. 1 (2008). The statute says:

> [N]o testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information may be used against the witness in any criminal case, but the witness may be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or in failing to answer, or in producing, or failing to produce, evidence in accordance with the order.

*Id.* The statute makes clear that once a witness is granted use immunity and is compelled to testify, that witness's testimony can be used against the witness only in connection with perjury, false swearing, or contempt charges.

---

5. The State also argues that Vega–Lara's prior testimony was admissible as substantive evidence under Minn. R. Evid. 801(d)(1)(A) and 807.

Morales asserts that Vega–Lara continued to have a Fifth Amendment privilege because Vega–Lara feared being prosecuted for perjury. Morales cites *Johnson* for the proposition that "the privilege against self-incrimination can properly be invoked based on fear of a perjury prosecution arising out of conflict between statements sought to be compelled and prior sworn testimony." 735 N.W.2d at 311.

Morales notes that both the State and the district court acknowledged at Morales's trial, and the State continues to acknowledge on appeal, that Vega–Lara could be prosecuted for perjury regarding his testimony at trial. Essentially, Morales argues that because the scope of immunity provided by the use-immunity statute, Minn.Stat. § 609.09 (2008), is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, use immunity does not abrogate the privilege and cannot be used to compel testimony over a claim of the privilege.

In *Johnson*, we addressed the appeals of two prison inmates. *Johnson*, 735 N.W.2d at 298. The issue in *Johnson* was whether the extension of incarceration as a sanction for refusal to admit a sex offense in a sex offender treatment program violates a convicted sex offender's Fifth Amendment privilege against self-incrimination. *Id.* at 297. We held that the extension of incarceration time for refusal to admit sexual offenses in sex-offender treatment rose to the level of compulsion for purposes of the Fifth Amendment. *Id.* at 309. Morales correctly asserts that we also held in *Johnson* that statements may be incriminating if those statements may support a conviction for perjury. *See id.* at 310–11. But he fails to recognize that Vega–Lara's situation can be distinguished from that of the two inmates in *Johnson*. Importantly, Vega–Lara had use immunity, while the inmates in *Johnson* did not. Therefore, we conclude that *Johnson* is not dispositive.

Our conclusion that *Johnson* is not dispositive does not end our analysis of whether Vega–Lara had a valid Fifth Amendment privilege once granted use immunity. The Supreme Court has said that immunity must be coextensive with the scope of the privilege against self-incrimination. *See Kastigar v. United States,* 406 U.S. 441, 449, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). If it is not, a witness's claim of privilege is justified. *Id.* In *Kastigar*, the Court explained:

> The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under [a] statute is coextensive with the scope of the privilege. If so, [a witness's] refusals to answer based on the privilege [are] unjustified . . . for the grant of immunity has removed the dangers against which the privilege protects.

*Id.* (footnote omitted). Based on *Kastigar*, we must determine whether use immunity, which allows immunized testimony to be used in perjury prosecutions, is coextensive with the privilege against self-incrimination. If use immunity is coextensive with the privilege, Vega–Lara did not have a valid Fifth Amendment privilege. Conversely, if use immunity is not coextensive with the privilege, Vega–Lara had a valid Fifth Amendment privilege and was justified in refusing to testify because the grant of use immunity was insufficient to abrogate his privilege.

The Supreme Court addressed the intersection of the privilege against compelled self-incrimination and use immunity in *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980). In *Apfelbaum*, Stanley Apfelbaum was called to testify before a grand jury about a

robbery. *Id.* at 117, 100 S.Ct. 948. At first, Apfelbaum refused to testify, claiming a Fifth Amendment privilege against compulsory self-incrimination. *Id.* at 117–18, 100 S.Ct. 948. The district court then granted Apfelbaum immunity and ordered him to testify. *Id.* at 118, 100 S.Ct. 948. Apfelbaum still refused to testify and was held in civil contempt. *Id.* at 118 n. 4, 100 S.Ct. 948. After 6 days of confinement, he relented and testified. *Id.* at 118 n. 4, 100 S.Ct. 948. The government later charged and convicted Apfelbaum of making false statements to the grand jury. *Id.* at 118–19, 100 S.Ct. 948. During the perjury trial, the government introduced true statements from Apfelbaum's immunized grand jury testimony in order to provide context for Apfelbaum's false statements and to demonstrate that he knew they were false. *Id.* at 119, 100 S.Ct. 948.

The issue addressed by the Supreme Court in *Apfelbaum* was whether use of true statements made in the course of immunized testimony to support a perjury conviction violated Apfelbaum's Fifth Amendment rights. *Apfelbaum,* 445 U.S. at 119–20, 100 S.Ct. 948. Ultimately, the Court held that both true and false statements made under a grant of immunity could be used against a witness in a trial for perjury in part because "a future intention to commit perjury or to make false statements if granted immunity ... is not by itself sufficient to create a substantial and real hazard that permits invocation of the Fifth Amendment." *Id.* at 131, 100 S.Ct. 948 (citations omitted) (internal quotations marks omitted). The Court explained that the Fifth Amendment does not protect "against false testimony that [an individual] might later decide to give," *id.* at 130, 100 S.Ct. 948, as there is "no doctrine of 'anticipatory perjury,'" *id.* at 131, 100 S.Ct. 948. According to the Court, "the Fifth Amendment 'does not endow the person who testifies with a li-

cense to commit perjury.'" *Id.* at 127, 100 S.Ct. 948. (quoting *Glickstein v. United States,* 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128 (1911)). The Court concluded that the Fifth Amendment does not protect an individual from prosecution for future perjury, *id.* at 131, 100 S.Ct. 948, and accordingly, the Fifth Amendment cannot be invoked by an individual who plans to commit perjury after being compelled to testify, *see id.* at 132, 100 S.Ct. 948. ("[P]rior to the immunity grant the witness had no Fifth Amendment right to answer falsely.") (Brennan, J., concurring).

In concluding that the Fifth Amendment did not protect Apfelbaum from self-incrimination for committing perjury, the Supreme Court acknowledged that Apfelbaum may have been better off if he were allowed to remain silent. *Apfelbaum,* 445 U.S. at 126, 100 S.Ct. 948. But the Court explained that "the benefits of remaining silent as a result of invocation of the Fifth Amendment privilege" should not be equated "with the protections conferred by the privilege." *Id.* at 127, 100 S.Ct. 948. Similarly, the Court explained that, in order for a grant of immunity to be coextensive with the Fifth Amendment privilege, the witness does not have to be treated as if he had remained silent. *Id.* at 124, 100 S.Ct. 948. The Court stated that the focus of an analysis determining whether immunity is coextensive with the Fifth Amendment should be on "the *protection* the privilege is designed to confer," rather than the "*effect* of the assertion" of the privilege—namely, silence. *Id.* In his concurring opinion, Justice Harry Blackmun similarly explained, "a grant of immunity may be a constitutionally adequate response to invocation of the privilege without perfectly replicating the effect of total silence." *Id.* at 134, 100 S.Ct. 948 (Blackmun, J., concurring). And, as Justice William Brennan's concurrence points out, "affording

the witness a right to lie with impunity would render the entire immunity transaction futile." *Id.* at 132, 100 S.Ct. 948 (Brennan, J., concurring).

For all the foregoing reasons, the Supreme Court concluded that the immunity granted to Apfelbaum was coextensive with his Fifth Amendment privilege. *See id.* at 131, 100 S.Ct. 948. In other words, though it is true that Apfelbaum's immunity did not protect him from prosecution for his future perjury, the Fifth Amendment did not protect him from future perjury either. Therefore, Apfelbaum did not have a Fifth Amendment right to refuse to testify, and the Fifth Amendment did not preclude the State from using Apfelbaum's untruthful as well as truthful immunized testimony to subsequently convict him of perjury. *See id.*

The Supreme Court's holding in *Apfelbaum* demonstrates that Vega–Lara had no Fifth Amendment right to testify falsely at Morales's trial. *See id.* at 130–31, 100 S.Ct. 948. Still, Morales argues that Vega–Lara could be convicted of perjury for testifying truthfully at Morales's trial if that testimony were inconsistent with his prior testimony. Morales supports his argument by citing subdivision 3 of Minnesota's perjury statute, which provides that an individual may be convicted for making inconsistent statements. *See* Minn.Stat. § 609.48, subd. 3 (2008). The statute provides:

> When the declarant has made two inconsistent statements under such circumstances that one or the other must be false and not believed by the declarant when made, it shall be sufficient for

conviction under this section to charge and the jury to find that, without determining which, one or the other of such statements was false and not believed by the declarant.

*Id.*

We recognize the important distinction between the facts in *Apfelbaum* and those before us here: the witness in *Apfelbaum* was granted immunity during his initial testimony under oath, but here, Vega–Lara testified prior to the immunized testimony at issue. Given that Minn.Stat. § 609.48, subd. 3, permits a perjury conviction to be based on inconsistent statements without proving which statement is false, and *Apfelbaum* allows the State to use truthful immunized testimony to support a perjury conviction, a person in Vega–Lara's position may fear perjury prosecution under Minn.Stat. § 609.48, subd. 3, for testifying truthfully under immunity.

But based on our interpretation of Minnesota law, an immunized witness has no basis to fear prosecution if he testifies truthfully. With respect to Minnesota's perjury statute, we agree with two federal appeals courts that a grant of use immunity "forecloses the government from prosecuting an immunized witness for perjury based upon *prior* false statements." *In re Grand Jury Proceedings,* 644 F.2d 348, 350 (5th Cir.1981); *accord In re Grand Jury Proceedings,* 625 F.2d 767, 770 (8th Cir.1980).[6] As the Eighth Circuit said in *In re O'Brien,* "truthful testimony before the grand jury poses no threat of prosecution for perjury based on prior inconsistent statements."[7] 728 F.2d 1172, 1174 (8th Cir.1984).

---

**6.** Though truthful immunized testimony was used to help prove Apfelbaum committed perjury, Apfelbaum was convicted of perjury because he also gave false immunized testimony. *Apfelbaum,* 445 U.S. at 116–17, 131, 100 S.Ct. 948. The Court in *Apfelbaum* explained

that "[immunized] testimony remains inadmissible in all prosecutions for offenses committed prior to the grant of immunity." *Id.* at 128, 100 S.Ct. 948.

**7.** The federal perjury statute, like the Minnesota perjury statute, provides for perjury con-

■ Based on the analysis in these cases, we conclude that immunized testimony cannot be used to convict an individual under Minn.Stat. § 609.48, subd. 3, when the statement inconsistent with that immunized testimony was made before the immunized testimony. Immunized testimony may be used to support a perjury conviction only if the fact-finder concludes that the immunized witness made a false material statement while under immunity, see Minn.Stat. § 609.48, subd. 1 (2008), or the immunized testimony is inconsistent with statements made after the immunized testimony, see Minn.Stat. § 609.48, subd. 3. Thus, Vega–Lara was not in danger of self-incrimination for testifying truthfully under the grant of use immunity at Morales's trial. Therefore, we conclude that once Vega–Lara was granted use immunity, he did not have a valid Fifth Amendment privilege.

■ Under our interpretation of Minnesota law, the use-immunity statute is appropriately coextensive with the Fifth Amendment privilege against self-incrimination. As stated above, though the Fifth Amendment privilege operates "to protect the witness from compulsion of *truthful* testimony of an incriminating nature," *Apfelbaum,* 445 U.S. at 135, 100 S.Ct. 948 (Blackmun, J., concurring), the Fifth Amendment does not protect "against false testimony that [an individual] later might decide to give," *id.* at 130, 100 S.Ct. 948 (majority opinion). Use immunity is coextensive with the Fifth Amendment privilege because once granted use immunity, a witness is subject to perjury prosecution only if he makes false material statements during his immunized testimony. The immunized witness is protected from incrimination only if he gives truthful testimony.

## B. Application of Mitchell Framework When a Witness Asserts an Invalid Privilege

Although we have determined that Vega–Lara did not have a valid Fifth Amendment privilege against testifying at Morales's trial, this conclusion does not end our analysis. We must next address the State's second assertion that the holdings in *State v. Mitchell,* 268 Minn. 513, 130 N.W.2d 128 (1964) and *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), do not apply to a situation where a witness claims an invalid privilege.

The State argues that because Vega–Lara did not have a valid Fifth Amendment privilege, the holdings in *Mitchell* and *Namet* do not apply, and the State's calling and questioning of Vega–Lara was proper. Morales argues that even if Vega–Lara did not have a valid Fifth

---

victions based on two inconsistent statements. *Compare* 18 U.S.C. § 1623(c) (2006), *with* Minn.Stat. § 609.48, subd. 3. The federal perjury statute, 18 U.S.C. § 1623(c), provides:

An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

(1) each declaration was material to the point in question, and

(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury.

Amendment privilege, the State's questioning of Vega–Lara was reversible error under the holdings in *Mitchell* and *Namet*.

In *Mitchell*, a defendant appealed his conviction, arguing that the State's direct examination of a co-conspirator who invoked his Fifth Amendment privilege and refused to answer questions was prejudicial error because the State "knew that the witness would claim immunity and that the only purpose of calling him was to discredit defendant with the jury." 268 Minn. at 515, 130 N.W.2d at 130. In addressing the defendant's claim, we first explained in *Mitchell* that a witness's claim of privilege can be prejudicial to a defendant because the refusal to answer a question invites the fact-finder to make inferences about what the answer to the question would have been had the witness answered. *Id.* at 516, 130 N.W.2d at 130 (citing *United States v. Maloney*, 262 F.2d 535, 537 (2d Cir.1959)). Given that the individual is refusing to testify under the privilege against self-incrimination, the tendency for a fact finder is to draw unfavorable inferences about the witness's likely answer. *See id.* at 516, 130 N.W.2d at 130. In those circumstances, a fact-finder is likely to impute the perceived culpability of the witness to the defendant. *See id.* at 516, 130 N.W.2d at 130. Accordingly, we held that calling a witness who the prosecutor knows will claim a privilege can constitute prejudicial misconduct.

We disagree on several grounds with the State's argument that *Mitchell* does not apply to situations where a witness claims an invalid privilege. First, though the witness in *Mitchell* invoked what appears to be a valid privilege, we did not specify whether our holding was limited to valid claims of privilege. *See id.* at 516–17, 130 N.W.2d at 129. Second, we have used the *Mitchell* framework to analyze a defendant's claim of unfair privilege in a situation where the witness called to testify did not have a valid privilege. *See State v. Black*, 291 N.W.2d 208, 212–13 (Minn. 1980), *abrogation on other grounds recognized by State v. Jones*, 556 N.W.2d 903 (Minn.1996). In *Black*, the State called and questioned a witness who refused to testify but did not claim or possess a valid privilege. *Id.* at 212. We nonetheless examined the record to determine whether the State's actions unfairly prejudiced the defendant under the *Mitchell* framework. 291 N.W.2d at 212–13.

Third, the *Mitchell* framework provides a sound analytical approach for situations where the State calls a witness who refuses to testify. This is so because defendants are just as likely to suffer from unfair inferences when a witness asserts an invalid Fifth Amendment privilege as when a witness asserts a valid privilege. For example, here, Vega–Lara responded to the State's first question by stating, "I plead the fifth. Refuse to answer." Regardless of whether the privilege was valid, the jury heard Vega–Lara claim that privilege, and every refusal provided the jury with an opportunity to make unfavorable inferences.

■ Courts in other jurisdictions agree that a defendant is unfairly prejudiced when a witness refuses to answer, regardless of whether the witness was protected by a valid privilege. These courts reason that "[j]uries are no less likely to draw improper inferences from an invalid assertion of privilege than from a valid assertion." *See United States v. Griffin*, 66 F.3d 68, 71 (5th Cir.1995); *accord Martin v. United States*, 756 A.2d 901, 905 (D.C. 2000); *People v. Gearns*, 457 Mich. 170, 577 N.W.2d 422, 434–35 (1998), *overruled on other grounds by People v. Lukity*, 460 Mich. 484, 596 N.W.2d 607 (1999). For the foregoing reasons, we conclude that in cases where the State calls a witness who

refuses to testify, the framework outlined in *Mitchell* should apply regardless of whether the refusal is based on a valid privilege.

#### C. Was the State's Examination of Vega–Lara Reversible Error?

 Having determined that *Mitchell* applies, we consider the facts of this case to determine whether the district court committed reversible error by allowing the State to call Vega–Lara as a witness. *See Mitchell*, 268 Minn. at 518, 130 N.W.2d at 132 ("We must determine the issue before us on the basis of the record."). We, as well as other courts, have articulated two different theories under which the State's decision to call a witness who refuses to testify may be reversible error. *Id.* at 517, 130 N.W.2d at 131; *Namet*, 373 U.S. at 186–187, 83 S.Ct. 1151. Under the first theory of error—the bad-faith theory—reversible error results, regardless of actual prejudice, "where the prosecution calls a witness for the purpose of prejudicing the defendant in the minds of the jury, knowing that the witness will claim immunity." *Mitchell*, 268 Minn. at 517, 130 N.W.2d at 130; *see also Namet*, 373 U.S. at 186, 83 S.Ct. 1151. Under the second theory of error—the unfair-prejudice theory—reversible error results if the State calls a witness in good faith and the State's "examination is of a type that has prejudiced defendant to the extent that he has been denied a fair trial." *Mitchell*, 268 Minn. at 517, 130 N.W.2d at 131; *see also Namet*, 373 U.S. at 187, 83 S.Ct. 1151.

#### i. Bad Faith

 Morales argues that the State called Vega–Lara in bad faith because the State knew Vega–Lara would claim a privilege and refuse to testify. In *Mitchell*, we stated that a codefendant or accomplice "may not be called [by the State] for the purpose of extracting a claim of privilege against incrimination" because the State "is obligated to refrain from invalid conduct creating an atmosphere prejudicial to the substantial rights of the defendant." 268 Minn. at 515–16, 130 N.W.2d at 130. Based on this premise, we held in *Mitchell* that "where the prosecution calls a witness for the purpose of prejudicing the defendant in the minds of the jury, knowing that the witness will claim immunity, reversible error results," regardless of actual prejudice. *Id.* at 517, 130 N.W.2d at 131.

We indicated in *Mitchell* that the State's knowledge that a witness will refuse to testify may be enough to conclude that it called the witness in bad faith. *See id.* at 516, 130 N.W.2d at 130. We quoted Judge Learned Hand for the proposition that "if the prosecution puts the question knowing the privilege will be asserted, 'it is charged with notice of the probable effect of his refusal upon the jury's mind.'" *Id.* at 516, 130 N.W.2d at 130 (quoting *United States v. Maloney*, 262 F.2d 535, 537 (2d Cir. 1959)). In both *Mitchell* and *Black*, in which we concluded that the State did not call a witness in bad faith, we noted that it was not clear whether the witness would actually refuse to answer questions. *Black*, 291 N.W.2d at 212; *Mitchell*, 268 Minn. at 520, 130 N.W.2d at 132.[8]

---

**8.** The finding of no bad faith in both *Mitchell* and *Black* was based on several factors. In *Mitchell*, we noted that it was not clear from the record whether the accomplice witness would refuse to testify, nor had the defendant argued at trial that the accomplice's claim of privilege would be prejudicial. 268 Minn. at 520, 130 N.W.2d at 132–33. In *Black*, we noted that the refusing witness had stated she would both testify and would not testify at Black's trial before the State called her as a witness. 291 N.W.2d at 212. We also noted that the witness had no valid privilege to refuse to testify, and that her refusal would put her in contempt. *See id.*

Here, unlike in *Mitchell* and *Black*, the State knew with a high degree of certainty that Vega–Lara would refuse to testify. Vega–Lara consistently and persistently refused to do so. In pretrial proceedings, Morales explained that Vega–Lara would not testify. Later, Vega–Lara's counsel explained to the district court that even if the court granted Vega–Lara immunity, he would not testify for fear of a perjury prosecution. Finally, immediately before being called as a witness, Vega–Lara reaffirmed that he would refuse to testify. And, unlike in *Mitchell*, Morales objected, asserting at trial that the State "wants[s] to call this witness solely for the purpose of having the jury see him, an alleged co-conspirator of the defendant, invoke a [F]ifth [A]mendment privilege" and objected to the State's decision to call Vega–Lara on those grounds. In this case, the State had "notice" that the jury would draw unfavorable inferences from Vega–Lara's refusal to testify and impute Vega–Lara's perceived culpability onto Morales. *See Mitchell*, 268 Minn. at 516, 130 N.W.2d at 130.

But because the district court ordered Vega–Lara to testify and the State believed that Vega–Lara did not have a valid privilege to refuse to testify, the State may have had a legitimate reason for calling Vega–Lara besides creating an atmosphere prejudicial to Morales by extracting a claim of privilege from Vega–Lara. *See id.* at 520, 130 N.W.2d at 132. The State may have called Vega–Lara so that the court would hold him in contempt upon his expected refusal. Though the lack of a valid privilege does not proscribe the application of the *Mitchell* framework to a defendant's claim of error, we have cited a lack of privilege and seeking to have a

refusing witness held in contempt as indications that the State did not call a witness in bad faith. *See Black*, 291 N.W.2d at 212.[9] Additionally, the State may have wanted to call Vega–Lara so that it could introduce Vega–Lara's prior testimony. *See id.* ("[I]t is fair to say that the prosecution called her to determine with certainty whether or not she would testify and, if not, to lay a foundation for the introduction of her prior statements and testimony."). Though the court did not allow Vega–Lara's prior testimony to be admitted as substantive evidence, Vega–Lara's prior testimony demonstrates that the State may have had other reasons for calling Vega–Lara besides "extracting a claim of privilege against incrimination." *Mitchell*, 268 Minn. at 515, 130 N.W.2d at 130.

We acknowledge that the State gave no indication that it wanted the district court to hold Vega–Lara in contempt, nor did it made such a request. Instead, the State sought to question Vega–Lara. The State believed it was entitled to call Vega–Lara and question him because it believed that Vega–Lara did not have a valid privilege. The State declared to the court:

> In this circumstance Mr. Vega–Lara has been granted use immunity by this Court, he has been ordered to answer all of the questions put to him by the State, and I would intend to ask him each question and if he chooses not to answer then we would proceed that way until I have exhausted the questions I intend to . . . ask him.

The State was mistaken in this assertion; it did not have an absolute right to question Vega–Lara. As we have already stated, a witness's refusal to testify can be unfairly prejudicial to the defendant even

---

**9.** We note that a better course of action may have been for the district court to hold Vega–Lara in contempt of court when he confirmed that he would not testify immediately before being called to the stand.

if the refusal is not legitimate. *See Griffin*, 66 F.3d at 71; *see also Martin*, 756 A.2d at 905; *Gearns*, 577 N.W.2d at 434–35.

It cannot be disputed that the State knew with a great degree of certainty that Vega–Lara would refuse to testify and therefore is " 'charged with notice of the probable effect of his refusal upon the jury's mind.' " *Mitchell*, 268 Minn. at 516, 130 N.W.2d at 130 (quoting *Maloney*, 262 F.2d at 537). But the record also indicates that the State may have called Vega–Lara as a witness for reasons other than to "obtain[ ] from him the claim of privilege against incrimination in the presence of the jury." *Id.* at 515, 130 N.W.2d at 130. Therefore, under the facts and circumstances of this case, we conclude that the State did not call Vega–Lara in bad faith.

### ii. Unfair Prejudice

■ Even though the State's decision to call Vega–Lara was not by itself reversible error, the unfairness of extracting a claim of privilege from Vega–Lara may still be reversible error under the second theory of error that we articulated in *Mitchell*—the unfair-prejudice theory. *See* 268 Minn. at 517, 130 N.W.2d at 131. When analyzing the unfair-prejudice theory, the focus is on the substance and manner of the State's examination of the witness rather than on the decision to call the witness to testify. In *Mitchell*, we stated that reversible error occurs when the State's examination of a witness who refuses to testify prejudices a defendant to the extent that he has been denied a fair trial. 268 Minn. at 517, 130 N.W.2d at 131. Similarly, the Supreme Court has said that reversible error occurs when "inferences from a witness' refusal to answer add[ ] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudice[ ] the defendant." *Namet*, 373 U.S. at 187, 83 S.Ct.

1151. Therefore, we next address whether the State's questioning of Vega–Lara was prejudicial to the extent that the act of questioning Vega–Lara denied Morales a fair trial. *See Mitchell*, 268 Minn. at 517, 130 N.W.2d at 131.

In concluding that there was no error under the unfair-prejudice theory, we observed in *Mitchell* that the State's questions "were brief, were not fact-laden, and did not go to the substance of the [charged] offense." *Id.* at 521, 130 N.W.2d at 133. In reaching the same conclusion in *Black*, we observed that the State's questions were brief and that the "jury was not left to speculate as to what [the witness's] testimony might have been, because her earlier statements were introduced into evidence" substantively as statements against penal interest under Minn. R. Evid. 804(b)(3). *Black*, 291 N.W.2d at 212–13.

Here, the circumstances of the State's questioning and Vega–Lara's refusals were quite different from those in *Mitchell* or *Black*. The State's direct examination of Vega–Lara was extensive, taking up 20 pages of trial transcript, and Vega–Lara refused to answer each question posed by the State. Moreover, the State's questions were heavily fact-laden and each went directly to the substance of the charged offenses. The questions were leading and represented an extensive narrative of the robbery and murder. The State asked Vega–Lara about the events leading up to the murder, including whether Vega–Lara spoke with Morales about robbing the house of prostitution, whether Vega–Lara went to the house carrying a gun on March 13 with Morales and Solorzano-O'Brien, whether Morales also carried a gun and wore a hat, and whether Vega–Lara and Solorzano-O'Brien went into the bedrooms with the two women while Mor-

ales sat on the couch. The State also asked a sequence of questions about the specific events of the murder, including these questions in the following order:

- "When you were at [the house of prostitution] on March 13th of 2006, did Angel Morales pull out his gun?"
- "[D]id Angel Morales point the gun at Victor Mesa–Ortiz for the purpose of robbing him?"
- "Did Victor Mesa–Ortiz resist when Angel Morales pointed the gun at him and tried to rob him?"
- "When Angel Morales and Victor Mesa–Ortiz were struggling over the gun that was held by Angel Morales, did you take your gun and shoot Victor Mesa–Ortiz?"

As Vega–Lara refused to answer each question, the State in essence attempted to impeach him with his prior testimony, asking further leading questions about the events of the crime. For example, the State was allowed to ask Vega–Lara, "Do you recall being asked was there a reason that Angel Morales wanted to go to [the house of prostitution].... And did you then say, 'yeah, because he had told me he wanted to rob the [house]?' " and, "Did you previously testify that [Morales] pointed the gun at Victor Mesa–Ortiz ... for the purpose of robbing him?"

When pieced together, the State's questions to Vega–Lara at trial provided the only detailed narrative of the crime that was consistent with the State's theory of the case. The only other evidence the State introduced that implicated Morales were statements Morales allegedly made to M.G. about his plans to rob a house of prostitution. But those statements gave little detail about Morales's plans, and the

credibility of M.G.'s testimony on these statements was attacked on cross-examination. In contrast, Vega–Lara's examination was lengthy and provided the jury with the only descriptive eyewitness account of the murder. The State had no other direct evidence—and very little circumstantial evidence—against Morales beyond evidence that a third man wearing a hat accompanied Vega–Lara and Solorzano–O'Brien to the house of prostitution on the day of the murder.

We guard against allowing the State to call a witness who refuses to testify because such refusals encourage the jury to draw unfavorable inferences that may prejudice the defendant. *See Mitchell*, 268 Minn. at 516, 130 N.W.2d at 130. Because Vega–Lara refused to answer each of the State's questions in what was a lengthy and detailed examination, the jury had several opportunities to draw inferences unfavorable to Morales. The fact that the State was allowed to introduce Vega–Lara's prior testimony for what was essentially impeachment purposes perhaps added to the prejudice, because Vega–Lara's prior testimony essentially supplied the jury with particular incriminating inferences consistent with the State's theory.[10]

In addition to the unfair-prejudice concern about improper inferences from an accomplice's refusal to testify articulated in *Mitchell*, we have warned in other cases against allowing the State to call a witness only to impeach the witness with prior testimony. In *State v. Dexter*, we affirmed a district court's ruling "barring the prosecution from impeaching one of its own witnesses with extrinsic evidence of prior inconsistent statement[s]" because the State sought "to present, in the guise of

---

**10.** Further adding to the unfair prejudice, the State's attempt to impeach Vega–Lara was based on Vega–Lara's prior testimony at his own trial, which may have been self-serving and unreliable because he testified as a criminal defendant, attempting to partially exonerate himself. *See Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

impeachment, evidence which is not otherwise admissible." 269 N.W.2d 721, 721 (Minn.1978). Later, in *State v. Ortlepp*, we explained that:

> [A] problem arises when a prosecutor calls a witness who has given a prior statement implicating the defendant.... If the prosecutor is permitted to call th[e] witness and use the prior statement for impeachment purposes, there is a large risk that the jury, even if properly instructed, will consider the prior statement as substantive evidence.

363 N.W.2d 39, 42–43 (Minn.1985). Here, because Vega–Lara's testimony consisted of nothing more than his refusals to testify, there was an especially great risk that the jury would treat his prior testimony as substantive evidence. As *Ortlepp* explains, the district court's instruction to the jury did not necessarily cure the prejudice. *See* 363 N.W.2d at 42–43.

We acknowledge that in some situations, the introduction of prior testimony may have the opposite effect: it may reduce the danger of unfair prejudice. For example, in *Black*, we stated that the State's questioning of the witness was not unfairly prejudicial in part because "[t]he jury was not left to speculate as to what [the witness's] testimony might have been" as the witness's prior testimony was introduced into evidence. 291 N.W.2d at 212. But in *Black*, the prior testimony was admitted as substantive evidence, *see id.* at 213; here, the evidence was not.

We conclude that the State's ability to call Vega–Lara and then present his prior testimony provided the State with an opportunity to introduce evidence that the district court had ruled was "not otherwise admissible." *See Dexter*, 269 N.W.2d at 721. In this situation, unlike in *Black*, the introduction of the prior testimony increased the unfair prejudice we were concerned about in *Mitchell*. Given that the State's examination of Vega–Lara was lengthy, provided the jury with numerous opportunities to make inferences, and additionally provided specific prejudicial inferences in the form of non-substantive evidence, we conclude that the State's questioning of Vega–Lara was prejudicial and unfair and amounted to reversible error under *Mitchell*.[11] Because we conclude that the questioning of Vega–Lara requires reversal of Morales's conviction, we need not address Morales's argument that the impeachment of Vega–Lara was improper for the reason that Vega–Lara's refusal to testify at Morales's trial was not inconsistent with and did not contradict his prior testimony.

■■■■ The dissent argues that the questioning of Vega–Lara was not unfairly prejudicial because the State "was at-

---

11. A parallel analysis can be made under a similar unfair-prejudice theory articulated by the Supreme Court in *Namet*. The examination of Vega–Lara was unfairly prejudicial because the inferences it created added "critical weight" to the State's case in a form not subject to cross-examination. *Namet*, 373 U.S. at 187, 83 S.Ct. 1151. The State's examination of Vega–Lara added critical weight because it provided the jury with the only descriptive eyewitness account of the murder. Moreover, because Vega–Lara refused to answer all but one question on cross-examination, that critical weight was in a form not subject to cross-examination.

In *Namet*, the Court found no reversible error because the witness answered several questions—there were "few invocations of privilege." *Namet*, 373 U.S. at 189, 83 S.Ct. 1151. Moreover, the Court found it significant that "the few claims of testimonial privilege were at most cumulative support for an inference already well established by the non-privileged portion of the witness' testimony." *Id.* Here, unlike in *Namet*, Vega–Lara refused to answer all questions on direct examination and the inferences were not well established by other testimony.

tempting to lay the foundation for Vega–Lara's testimony to be admitted as substantive evidence under Minn. R. Evid. 801(d)(1)(A)." The dissent states that "[b]ecause the State's questions were grounded in our rule of evidence," Morales was not subject to unfair prejudice. We disagree. Even if the State's actions were within the rules of evidence, that fact alone does not dictate that we conclude the State's actions were not unfairly prejudicial. According to *Mitchell*, the test is whether the State's examination of the refusing witness was brief, fact-laden, and went to the substance of the charged offense—not whether the State was following the rules of evidence in questioning the witness. 268 Minn. at 521, 130 N.W.2d at 133. The same principle is true in other contexts: even if evidence is admissible under some rule of evidence, it may be error to admit that evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403.

In *Black*, we cited the State's need to lay foundation for a prior inconsistent statement as a legitimate reason to call a witness the State thought would refuse to testify. 291 N.W.2d at 212. But we did not cite the need for foundation as a reason why the questioning of the witness was not prejudicial to the defendant in *Black*. Rather, we concluded that the questioning of a refusing witness was not reversible error after considering the substance of the questioning and determining that the questions were brief. *Id.* It appears that in *Black*, the witness's attorney and the district court asked the witness questions, and then the court held the witness in contempt after the witness refused to testify during direct examination by the State. *See id.* Nothing in our opinion in *Black* suggests that the State was allowed to question the witness at length after she refused to testify. Therefore, the questioning at issue here is distinguishable.

We recognize that the State was in a difficult position in this case. The only alleged eyewitness to the crime, beside Morales, refused to testify after being ordered to do so by the district court. Regardless of the State's difficult position, Morales has a right to a fair trial, and the obstinacy of a witness who refuses to testify cannot threaten that right or justify trial conduct we held in *Mitchell* to be unfairly prejudicial. We and other jurisdictions have explained that a witness's refusal to testify can be prejudicial to the defendant when the questions asked of the witness are fact-laden and " 'plant in the jury's mind full details as to how [the State] claimed [the] crime was committed.' " *Mitchell*, 268 Minn. at 520–21, 130 N.W.2d at 133 (quoting *Washburn v. State*, 164 Tex.Crim. 448, 299 S.W.2d 706, 707 (Tex.Crim.App.1956)). Neither Vega–Lara's refusal to cooperate nor the State's need to lay foundation excuses the State's unfairly prejudicial questioning.

Given the State's difficult position and the risk of unfair prejudice, a better course of action may have been for the district court to allow the State to question Vega–Lara outside of the presence of the jury in order to "lay foundation," or, in other words, to ascertain if Vega–Lara would testify in a manner inconsistent with his previous testimony. Under such a scenario, if the district court ultimately determined that the evidence is not admissible as substantive evidence as the court did here, there would have been no unfair prejudice to Morales because the prejudicial questioning would have occurred outside the presence of the jury.

### iii. Were Vega–Lara's Prior Statements Admissible as Substantive Evidence?

 The State argues that the district court erred when it refused to admit

Vega–Lara's statements as substantive evidence under the catchall hearsay exception in Minn. R. Evid. 807, or as non-hearsay under Minn. R. Evid. 801(d)(1)(A). The State then cites *Ortlepp*, 363 N.W.2d 39 (Minn.1985) for the proposition that any *Dexter* problem that may arise when a prosecutor calls a witness and is permitted to use a prior statement for impeachment purposes is resolved if the prior statements admitted for impeachment purposes were also admissible as substantive evidence. *See id.* at 42–43. According to the State's argument, if Vega–Lara's statements were admissible as substantive evidence, there was no reversible error.

While we may have said in *Ortlepp* that there is no *Dexter* problem if the impeachment evidence was also admissible as substantive evidence, we have never said that such an event would resolve concerns under *Mitchell*. But, as indicated above, we did state in *Black* that the admission of a refusing witness's prior statement reduced the unfair prejudice to the defendant because the prior testimony made it so "[t]he jury was not left to speculate as to what [the witness's] testimony might have been." 291 N.W.2d at 212. If Vega–Lara's prior out-of-court statements were admissible substantively under Rules 807 or 801(d)(1)(A), that fact may affect whether Morales was unfairly prejudiced by the State's questioning of Vega–Lara. Therefore, we address the State's claim that Vega–Lara's testimony was admissible as substantive evidence under Rules 801(d)(1)(A) and 807.

Minnesota Rule of Evidence 801(d)(1)(A) provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Prior statements must meet all the requirements under Rule 801(d)(1)(A) in order to be admissible as substantive evidence. We conclude that Vega–Lara's prior testimony cannot be admitted under Rule 801(d)(1)(A) because Vega–Lara was not subject to cross examination at Morales's trial "concerning the statement[s]." Rule 801(d)(1) requires that a witness "be 'testable about the statement, meaning that he must be reasonably responsive to questions on the circumstances in which he made it.'" *State v. Amos*, 658 N.W.2d 201, 206 (Minn.2003) (quoting 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 404, at 175 (2d ed.1994)). Vega–Lara answered one question on cross-examination but was otherwise completely unresponsive. He refused to answer all other questions regarding his prior testimony. For example, counsel for Morales asked Vega–Lara, "Did you testify at your own trial that the planning was done by Mr. Morales in order to place the blame on Mr. Morales instead of yourself?" And Vega–Lara responded, "Refuse to answer." This answer, like all but one of Vega–Lara's answers, was not "reasonably responsive" to the question asked. *See Amos*, 658 N.W.2d at 206. Accordingly, we conclude that Vega–Lara was not "reasonably responsive" to the questions regarding the circumstances in which he made his prior statements, and therefore, his prior testimony was not admissible under Rule 801(d)(1)(A). Having reached this conclusion, we need not address the other requirements of Rule 801(d)(1)(A). Therefore, we hold that Vega–Lara's prior statements were not admissible as substantive evidence under Rule 801(d)(1)(A).

The State argues that Vega–Lara's testimony was also admissible as substantive evidence under Minn. R. Evid. 807. Rule

807 is the residual exception to the rule against admitting hearsay. It provides:

A statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing, to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it. . . .

Minn. R. Evid. 807. Here, we conclude that Vega–Lara's prior statements do not have "equivalent circumstantial guarantees of trustworthiness" as the statements intended to be covered by Rules 803 and 804. While Vega–Lara's statements were made under oath, he was testifying at his own trial and had much to gain from bending the truth and implicating others in the crime. Thus, the State has failed to show that Vega–Lara's statements were sufficiently reliable to overcome the general prohibition against admitting out-of-court statements.

Additionally, as the district court noted, there were "notice issues" with respect to the admission of Vega–Lara's prior testimony under Rule 807. The State sent a transcript of Vega–Lara's prior testimony to Morales on July 20, 2007, and Morales knew Vega–Lara was on the State's witness list. But there was no pretrial notice that the State would seek to introduce Vega–Lara's prior testimony as substantive evidence under Rule 807 or any other hearsay exception. The State moved to admit a transcript of Vega–Lara's prior testimony as substantive evidence near the close of trial.

We conclude that Vega–Lara's prior testimony was not admissible as substantive evidence under Rule 807. Nor was it admissible as substantive evidence under Rule 801(d)(1)(A). Therefore, the *Dexter* problem created when the State called Vega–Lara as a witness and used his prior testimony was not resolved. Similarly, the unfair prejudice to Morales caused by the State's questioning of Vega–Lara, a refusing witness, was not reduced.

For all the foregoing reasons, we conclude that the State's examination of Vega–Lara, an accomplice witness who refused to testify, was prejudicial to Morales to such an extent that it denied Morales a fair trial. Under *Mitchell*, such unfair prejudice is reversible error. Therefore, we reverse and remand for a new trial.

## II.

Even though we have determined that Morales is entitled to a new trial based on the State's unfairly prejudicial examination of Vega–Lara under *Mitchell* and *Namet*, we still must address the State's second contention. More particularly, we must address the State's argument that the court of appeals erred when it reversed the district court's decision to admit Vega–Lara's prior out-of-court statements to M.G. Our response to this question may affect the new trial.

■ Vega–Lara's prior out-of-court statements to M.G. were admitted by the district court under the statement-against-interest exception to the hearsay rule in

Minn. R. Evid. 804(b)(3). Evidentiary rulings by a district court generally rest within that court's discretion. *State v. Henderson,* 620 N.W.2d 688, 696 (Minn. 2001). Therefore, we will not reverse the district court's decision to admit Vega–Lara's statements to M.G. absent a clear abuse of discretion. *See id.*

At trial, the State called M.G. to testify about statements Vega–Lara made to him regarding the robbery and murder of Mesa–Ortiz. Over a hearsay objection by Morales, the district court admitted several of Vega–Lara's statements to M.G. about the robbery and murder under Minn. R. Evid. 804(b)(3), the statement-against-interest exception. Morales challenges the admission of only some of the statements. The three statements he challenges are as follows:

> State: And during that conversation with Felipe Vega–Lara, did he tell you that he and Tarun Solorzano–O'Brien and *another person* went to the [house] to commit a robbery?
>
> M.G.: Yes.
>
> State: And did Felipe Vega–Lara tell you that both he and *another person* had a handgun when they went to that location?
>
> M.G.: Yes.
>
> . . . .
>
> State: Okay. When Mr. Vega–Lara talked to you about the robbery at the [house], did he tell you that *another person* was struggling with the victim and Mr. Vega–Lara shot the victim?
>
> M.G.: Yes.

(Emphasis added.) The foregoing statements were altered before being admitted at trial. In his original statement to the police, M.G. stated that Vega–Lara specifically named "Morales." At trial, the State offered to substitute the words "another person" for Morales and the court agreed to the substitution.

The court of appeals held that the district court erred in admitting Vega–Lara's statements to M.G. *Morales,* 764 N.W.2d at 627. The court of appeals explained that the statements "were not, on balance, against Vega–Lara's penal interest; rather, they tended to minimize his own culpability in the offense." *Id.* The court also stated that the State's mention of "another person" was an obvious reference to Morales and an ineffective word substitution. *Id.* at 626–27.

As it did throughout the trial, the State concedes on appeal that the parts of Vega–Lara's statements to M.G. that specifically mention "Morales" would not be admissible under the statement-against-interest exception to the hearsay rule. But, the State notes that it substituted the words "another person" at trial and did not allow M.G. to mention Morales. The State argues that the altered statements were properly admitted because substituting "another person" for Morales's name was appropriate and sufficiently protected Morales from prejudice.[12] The State acknowledges that it mistakenly failed to

---

12. The State relies on an Eighth Circuit Court of Appeals decision, *United States v. Logan,* 210 F.3d 820, 821 (8th Cir.2000), as support for its assertion that substituting "another person" for Morales's name was appropriate. But *Logan* addresses whether the admission of a nontestifying codefendant's out-of-court confession in a joint trial violated a defendant's Confrontation Clause rights. *Id.* Because *Logan* addresses the Confrontation Clause in the context of joint criminal trials in federal court and does not address the statement-against-interest exception to the hearsay rule, we conclude it is not instructive in this case. Instead, we will determine whether Vega–Lara's statements to M.G. are admissible by conducting an analysis of the statement-against-interest exception to the hearsay rule and cases that apply the rule.

make the substitution in its closing argument, but asserts that this mistake does not affect the admissibility of the earlier-admitted evidence.

Morales asserts that Vega–Lara's statements are not self-incriminating because they inculpate Morales. He also argues that substituting "another person" for "Morales" did not effectively "transform the inadmissible, non-self-incriminatory hearsay statements into admissible statements against Vega–Lara's penal interest" because the substituted statements still shifted blame onto a third person. Morales asserts that the jury could infer the words "another person" referred to Morales because M.G. mentioned Morales's name in other contexts during his testimony and the State failed to abide by the substitution in its closing statement.

### A. The Statement–Against–Interest Exception

■ Hearsay is inadmissible unless an exception applies. Minn. R. Evid. 802. Minnesota Rule of Evidence 804(b)(3) provides an exception to the hearsay rule for statements made against a declarant's interest. The rule states that if a declarant is unavailable, a statement is admissible if, at the time of its making, it "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Minn. R. Evid. 804(b)(3).[13] Determining the admissibility of "declarations

against penal interest" under Rule 804(b)(3) requires three steps:

> First, the court must determine if the declarant was unavailable to testify at trial. Second, the court must determine that the statement must "at the time of its making ... so far [tend] to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Third, the court must scrutinize the statements to avoid violating the Confrontation Clause.

*State v. Tovar*, 605 N.W.2d 717, 723 (Minn. 2000) (citations omitted).

### B. Unavailability of a Declarant

■ As we articulated it in *Tovar*, the first step in determining whether a statement is admissible under Rule 804(b)(3) is to determine whether Vega–Lara, the declarant, was unavailable. *See* 605 N.W.2d at 723. Minnesota Rule of Evidence 804(a)(2) states that a witness is unavailable for purposes of hearsay exceptions if he "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." The comment to Rule 804 states that "[i]f the declarant is present at trial but will not or cannot testify as to an issue for any reason, whether justified or not, the declarant is deemed to be unavailable on that issue for the purposes of the rule." Minn. R. Evid. 804 comm. cmt.1989.

---

**13.** The full text of Minn. R. Evid. 804(b)(3) provides:

> (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> ....
>
> (3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal

liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Though Vega–Lara was physically present at Morales's trial, it is undisputed that he consistently refused to testify about the robbery and murder—the subject matter of his statements to M.G.—as well as his conversation with M.G. We conclude that Vega–Lara's persistent and consistent refusal to testify, despite the court's order compelling him to do so, made Vega–Lara unavailable for purposes of Rule 804(b)(3).

### C. Statements Subject Declarant to Criminal Liability

■■■ The second step articulated in *Tovar* is to determine whether Vega–Lara's admitted statements were against Vega–Lara's interest in that they so far tended to subject Vega–Lara to criminal liability that a reasonable person in Vega–Lara's position would not have made the statements unless believing them to be true. *See Tovar,* 605 N.W.2d at 723; Minn. R. Evid. 804(b)(3). In *Williamson v. United States,* the Supreme Court concluded that the word "statement," as used in the statement-against-interest exception, of the Fed.R.Evid. 804(b)(3), should be narrowly construed as "a single declaration or remark" rather than an entire confession narrative. 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (citation omitted) (internal quotation marks omitted); *see also Jones,* 556 N.W.2d at 908. *Williamson* provides that the appropriate analysis under Rule 804(b)(3) does not consider whether an entire confession is, on balance, against the declarant's interest. 512 U.S. at 600–01, 114 S.Ct. 2431. Rather, courts must analyze whether individual declarations or remarks within a confession or conversation are each against the declarant's interest. *Id.*

Explaining its holding, the Supreme Court in *Williamson* stated that Federal Rule 804(b)(3) "is founded on the common-sense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." 512 U.S. at 599, 114 S.Ct. 2431. The Court concluded that self-exculpatory statements embedded in a broader self-inculpatory narrative are not admissible under Rule 804(b)(3) because they "are exactly the [statements] which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements." 512 U.S. at 600, 114 S.Ct. 2431. The Court held that Rule 804(b)(3) therefore "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson,* 512 U.S. at 600–01, 114 S.Ct. 2431.

■■■ After *Williamson,* the question for determining admissibility under Rule 804(b)(3) is still whether, in light of all the surrounding circumstances, "the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" *Williamson,* 512 U.S. at 603–04, 114 S.Ct. 2431 (quoting Fed.R.Evid. 804(b)(3)). Given the Court's definition of "statement" in *Williamson,* courts must consider whether each declaration or remark—rather than the narrative or conversation as a whole—is sufficiently against the declarant's interest when determining whether a statement is admissible under the Rule 804(b)(3) exception. We adopted the *Williamson* rule in *State v. Ford* and now require courts to parse a declarant's generally self-inculpatory narrative to separate and omit from the narrative non-self-inculpatory declarations or remarks. *State v. Ford,* 539 N.W.2d 214,

227 (Minn.1995) (citing *Williamson*, 512 U.S. at 600–01, 114 S.Ct. 2431); *see also Tovar*, 605 N.W.2d at 723.

Here, we consider Vega–Lara's confession to M.G. Though the confession may have been inculpatory as a whole, *Williamson* and *Ford* provide that we must individually analyze each of Vega–Lara's statements within the confession narrative to determine if they are admissible under Minn. R. Evid. 804(b)(3). *See Williamson*, 512 U.S. at 600–01, 114 S.Ct. 2431; *Ford*, 539 N.W.2d at 227. If each of the three challenged statements was sufficiently against Vega–Lara's penal interest in light of the surrounding circumstances, the district court did not err by admitting the statements.[14]

▇▇▇ We first observe that each of the three challenged statements refer to and incriminate "another person." But Rule 804(b)(3) does not necessarily preclude the admission of a statement that inculpates a third person. Though the Supreme Court, when it interpreted Fed.R.Evid. 804(b)(3) in *Williamson*, warned that confessions by an accomplice may not be entirely self-inculpatory, the Court did not announce a categorical rule that requires the exclusion of statements with incriminating references to third parties. *See* 512 U.S. at 601, 603, 114 S.Ct. 2431; *see also* Fed.

R.Evid. 804 advisory committee's note ("These decisions, however, by no means require that all statements implicating another person be excluded from the category of declarations against interest.").[15] In fact, the Court suggested that a statement that names a third party may be admissible when it said, "Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor." *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431. As Justice Antonin Scalia explained in his concurrence, "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant *names another person* or implicates a possible codefendant." *Id.* at 606, 114 S.Ct. 2431 (Scalia, J., concurring) (emphasis added).

Under the Supreme Court's holding in *Williamson*, statements that name or incriminate a third party may not be per se inadmissible. But it is clear that such statements should be scrutinized carefully. This is because they tend not to be entirely self-inculpatory. But such statements can be admitted under the statement-against-interest exception to the hearsay rule if, in light of all the surrounding circumstances, they are "sufficiently against

---

**14.** Though the district court must screen admitted confessions or conversations to omit non-self-inculpatory statements, the sieve we use for the screening must not be too fine. The question is not whether the district court should have required the State to remove the phrase "another person" from Vega–Lara's comments to M.G. This is because "another person" is not itself a statement; it does not amount to a declaration or a remark. Rather, our focus is on each of Vega–Lara's statements individually, and we must consider each of the individual statements as a whole.

**15.** Courts in several other jurisdictions agree that there is no per se rule in *Williamson* that statements with incriminating references to

third parties are not self-inculpatory. *See United States v. Centracchio*, 265 F.3d 518, 526 (7th Cir.2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *United States v. Hammond*, 681 A.2d 1140, 1144–45 (D.C.1996); *State v. Prasertphong*, 206 Ariz. 70, 75 P.3d 675, 686–87 (2003), *vacated and remanded on other grounds*, 541 U.S. 1039, 124 S.Ct. 2165, 158 L.Ed.2d 727 (2004); *State v. Hallum*, 585 N.W.2d 249, 255 (Iowa 1998), *vacated and remanded on other grounds*, 527 U.S. 1001, 119 S.Ct. 2335, 144 L.Ed.2d 233 (1999); *People v. James*, 93 N.Y.2d 620, 695 N.Y.S.2d 715, 717 N.E.2d 1052, 1062–63 (1999).

the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" *Williamson,* 512 U.S. at 603–04, 114 S.Ct. 2431 (quoting Fed.R.Evid. 804(b)(3)).[16]

Based upon the foregoing analytical framework, even though Vega–Lara's three statements to M.G. refer to and incriminate "another person" they may nonetheless be admitted if they are truly self-inculpatory. In *Williamson,* the Supreme Court suggested that the confessions of arrested accomplices may not be admissible if they are merely attempts to shift blame or curry favor. 512 U.S. at 603, 114 S.Ct. 2431. Similarly, in *Tovar,* we concluded that a declarant's statements

were self-interested and non-self-inculpatory "because they were made in an attempt to obtain a plea bargain and [the declarant] appeared to downplay his own involvement in [the] murder and exaggerate the involvement of others." 605 N.W.2d at 724. Here, Vega–Lara was not speaking with law enforcement agents, attempting to secure a plea bargain in exchange for informing on accomplices, or testifying at his own trial, attempting to lessen his culpability. Instead, Vega–Lara was conversing with a friend, without any expectation that his statements could be used to "curry favor" with law enforcement. *Williamson,* 512 U.S. at 603, 114 S.Ct. 2431.[17]

Additionally, though Vega–Lara's statements demonstrate that other individuals

**16.** We acknowledge that, along with the Supreme Court, we have often observed that the statements of an accomplice that incriminate a criminal defendant are unreliable in the context of pre-*Crawford* Confrontation Clause cases. *See, e.g., Lilly v. Virginia,* 527 U.S. 116, 130–31, 133, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (stating that confessions by an accomplice that shift or spread blame are inherently unreliable); *State v. King,* 622 N.W.2d 800, 808–09 (Minn.2001) (same). But the issue in the cases that warn about the untrustworthiness of co-accomplice confessions is not the same issue before us here. First, Vega–Lara's statements as modified by the parties' substitution agreement incriminate "another person," not Morales directly. Second, the issue in *Lilly* was whether the defendant's Sixth Amendment Confrontation right "was violated by admitting into evidence at his trial a nontestifying accomplice's entire confession that contained some statements against the accomplice's penal interest and others that inculpated the accused." 527 U.S. at 120, 119 S.Ct. 1887. Applying the now-discarded rule from *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court determined that the statement-against-interest exception was not a "firmly rooted" hearsay exception. *Lilly,* 527 U.S. at 134, 119 S.Ct. 1887. It also concluded that the particular hearsay at issue did not contain "particularized guarantees of trustworthiness." *Id.* at 137–38, 119 S.Ct. 1887 (citation omitted) (internal quotations omit-

ted). We note that the test for the statement-against-interest exception is the same regardless of the identity of the declarant: "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *Williamson,* 512 U.S. at 603–04, 114 S.Ct. 2431 (quoting Fed.R.Evid. 804(b)(3)).

**17.** The advisory committee's notes to Fed. R.Evid. 804 suggest that statements that inculpate a third party can be admitted as a statement against a declarant's interest, especially in situations where the declarant is talking to someone other than a law enforcement agent:

Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.... On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying.

may have been involved in the robbery and murder of Mesa–Ortiz, the statements do not shift blame *away* from Vega–Lara. In the first two statements, Vega–Lara admitted that he and another person each carried a gun and went to the house of prostitution with the intent to commit a robbery. The fact that Vega–Lara claimed that another person went with him and also carried a gun does not lessen Vega–Lara's own culpability. In these first two statements, Vega–Lara did not downplay his own involvement or exaggerate the involvement of others. The statements so far tended to subject Vega–Lara to criminal liability that a reasonable person would not have made the statements if they were not true.

Vega–Lara's third statement, as relayed by M.G. was that "another person was struggling with the victim and Mr. Vega–Lara shot the victim." This statement presents a closer call because it could be interpreted as Vega–Lara offering a justification for the shooting—that another person was struggling with Mesa–Ortiz. But even this statement falls short of the kind of finger-pointing and blame-shifting behavior characterized as unreliable in *Williamson*. *See* 512 U.S. at 603, 114 S.Ct. 2431. As the statement was relayed to the jury, Vega–Lara did not explicitly say that he shot Mesa–Ortiz *because* of the struggle. In the context of conversing with M.G., Vega–Lara was simply recounting the events as he remembered them. At its core, the third statement is self-inculpatory because it identifies Vega–Lara as the shooter and tends to subject Vega–Lara to criminal liability. Further, it does so without shifting blame, without exaggerating "another person's" culpabili-

ty, or lessening the criminality of Vega–Lara's act at the expense of a third person. We conclude that the third statement was sufficiently against Vega–Lara's penal interest that a reasonable person in Vega–Lara's position would not have made the statement unless he believed it was true.

For the foregoing reasons, we conclude that all three statements to M.G. directly inculpate Vega–Lara. *Cf. Tovar*, 605 N.W.2d at 723 ("This analysis requires the court to construe the term 'statement' narrowly and allow only those statements that directly inculpate the declarant. . . ."). In light of the circumstances, the fact that Vega–Lara's three statements inculpate "another person" as well as himself does not make them less reliable. We conclude that each statement so tended to subject Vega–Lara to criminal liability without lessening the criminality of his act at the expense of a third party that a reasonable person in Vega–Lara's position would not have made the statements if they were not true.[18]

### D. Confrontation Clause Considerations

The third step as we articulated it in *Tovar* in determining whether a hearsay statement is admissible as a statement-against-interest is to consider whether the admission of the statement violated the Confrontation Clause of the Sixth Amendment. *State v. Tovar*, 605 N.W.2d 717. In *Crawford v. Washington*, the Supreme Court held that a witness's out-of-court testimonial statements are not admissible unless the witness is unavailable and the defendant had a prior opportunity to cross-

**18.** We acknowledge that our analysis of statements that incriminate third parties might suggest that the State conceded too much when it admitted that those parts of Vega–Lara's statements that explicitly named Mor-

ales were inadmissible. But the question of whether the original version of the statements would have been admissible was not raised or briefed before us. Therefore, we do not address it.

examine the witness. 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Here, Vega–Lara made the challenged statements to a friend; he was not being interrogated by the police and he did not make the statements before a grand jury, at a preliminary hearing, or at a trial. Based on these circumstances, we conclude that these statements are not testimonial and therefore their admission did not violate the Confrontation Clause. *See State v. Her,* 750 N.W.2d 258, 265 (Minn.2008) (stating that the admission of nontestimonial hearsay statements does not violate a defendant's confrontation rights), *vacated and remanded on other grounds,* —— U.S. ——, 129 S.Ct. 929, 173 L.Ed.2d 101 (2009).

Having considered the three analytical steps articulated in *Tovar* to determine whether Vega–Lara's three statements to M.G. were admissible under Minn. R. Evid. 804(b)(3), we conclude that Vega–Lara's statements were admissible. More particularly, we conclude: (1) Vega–Lara was unavailable for purposes of Minn. R. Evid. 804; (2) each statement directly inculpated Vega–Lara and the statements were sufficiently against Vega–Lara's penal interest that a reasonable person in his position would not have made the statements unless he believed them to be true; and (3) the admission of the statements did not violate Morales's confrontation rights. Therefore we hold that the district court did not abuse its discretion when it admitted, under Minn. R. Evid. 804(b)(3), the three statements Vega–Lara made to M.G.

Affirmed in part, reversed in part, and remanded.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice (dissenting).

I respectfully dissent. The majority holds that Morales is entitled to a new trial because the State attempted to lay the foundation for the admission of testimony codefendant Felipe Vega–Lara gave during his own trial. In response to Vega–Lara's refusal to answer questions in reliance on a nonexistent privilege, the State attempted to lay a foundation to have Vega–Lara's testimony from his earlier trial admitted as substantive evidence. The majority holds that the State's attempt to lay this foundation unfairly prejudiced Morales and entitles him to a new trial. I disagree. I would hold that Morales was not unfairly prejudiced and would affirm his conviction.

I.

As the majority notes, Vega–Lara testified at his own trial that he and Morales went to the house of prostitution in Minneapolis on the night of the murder, carrying loaded guns and intending to commit a robbery. During a struggle for Morales's gun, Vega–Lara said that he shot the victim. The State sought to offer this same evidence during Morales's trial. But Vega–Lara refused to testify, relying on a nonexistent privilege. The majority holds, and I agree, that the State did not call Vega–Lara in bad faith.

The majority nonetheless reverses Morales's conviction based on how the State attempted to address Vega–Lara's assertion of a nonexistent privilege. Specifically, in the face of Vega–Lara's refusal to testify, the State attempted to lay the foundation for the admission of Vega–Lara's testimony from his own trial as prior inconsistent statements under Minn. R. Evid. 801(d)(1)(A). This rule requires that a foundation be laid before the evidence is admitted. The proponent of the evidence must ask the witness a question

about which the witness has already been questioned under oath. *See* Minn. R. Evid. 801(d)(1)(A). The witness must give a response inconsistent with the earlier testimony. *See* Minn. R. Evid. 801(d)(1). Finally, the witness must be subject to cross-examination concerning the statement. *See id.* In the questioning that the majority finds amounts to reversible error, the State was attempting to lay the foundation our rule of evidence requires. The prosecutor asked Vega–Lara a series of questions about Vega–Lara's testimony at his earlier trial. Morales's attorney then cross-examined Vega–Lara. But Vega–Lara refused to answer the questions, claiming an invalid privilege. Because Vega–Lara refused to answer the questions, the majority now reverses Morales's conviction.

The majority attempts to find support for this result in *State v. Mitchell,* 268 Minn. 513, 130 N.W.2d 128 (1964). Citing *Mitchell,* the majority concludes that a new trial is warranted when the prosecution calls a witness in good faith, but the witness claims a nonexistent privilege and as a result the witness's "examination is of a type that has prejudiced [a] defendant to the extent that he has been denied a fair trial." *See Mitchell,* 268 Minn. at 517, 130 N.W.2d at 131. *Mitchell* does not support the result the majority reaches.

The rule we adopted in *Mitchell* requires that the defendant be *unfairly* prejudiced by the questioning of a witness claiming a privilege in order to be entitled to a new trial. *See Namet v. United States,* 373 U.S. 179, 187, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963) (explaining that a new trial is warranted if "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant"). In

*Mitchell,* we said that "where there is an apparent want of good faith on the part of the prosecuting attorney, calling as a witness a coconspirator who did not intend to testify for the prosecution and obtaining from him the claim of privilege against incrimination in the presence of the jury is prejudicial misconduct." 268 Minn. at 515, 130 N.W.2d at 130. But we noted that where, as in this case, the witness is called in good faith, unfair prejudice is not presumed, but must be demonstrated. *Id.* at 517, 130 N.W.2d at 131.

*Mitchell* provides additional guidance as to what constitutes unfair prejudice in this context: " 'Where a prosecutor is charged with conduct so prejudicial as to amount to reversible error, the charge should be made good by showing a successful effort to influence the jury against a defendant by some means clearly indefensible as a matter of law.' " *Id.* at 517, 130 N.W.2d at 131 (quoting *United States v. Hiss,* 185 F.2d 822, 832 (2d Cir.1950)); *see also State v. Black,* 291 N.W.2d 208, 212 (Minn.1980) (holding that "the prosecutor's examination was not of a type that prejudiced the defendant to the extent that he was denied a fair trial"). We did not find the requisite unfair prejudice in *Mitchell* and I do not find it here.

The State's questioning of Vega–Lara cannot be said to be " 'clearly indefensible as a matter of law.' " *Mitchell,* 268 Minn. at 517, 130 N.W.2d at 131 (quoting *Hiss,* 185 F.2d at 832). To the contrary, and as discussed above, the prosecutor, in questioning Vega–Lara, was attempting to lay the foundation for Vega–Lara's testimony from his trial to be admitted as substantive evidence under Minn. R. Evid. 801(d)(1)(A). Far from being "clearly indefensible as a matter of law," laying this foundation was a necessary response to a crucial witness's wrongful refusal to testify on the stand. Further, admission under

Minn. R. Evid. 801(d)(1)(A) was the only avenue reasonably available to the prosecution to get the evidence admitted substantively. This "justif[ies] ... the conduct complained of" by Morales, *Mitchell*, 268 Minn. at 517, 130 N.W.2d at 131, as it was allowable under the Minnesota Rules of Evidence and was made necessary by Vega–Lara's invocation of a nonexistent privilege.

The majority also attempts to find support for its conclusion in *Namet*. But *Namet* does not help the majority. As the Court noted there, an important inquiry is whether "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination." 373 U.S. at 187, 83 S.Ct. 1151. Even if Vega–Lara's refusal to answer questions added "critical weight to the prosecution's case," *id.*, Vega–Lara was subject to important cross-examination, which under *Namet* means that Morales was not unfairly prejudiced. *See id.* Vega–Lara answered one question out of the six that Morales's counsel posed: "Did you testify that you had not intended to kill [the victim]?" Vega–Lara admitted that he had testified to this at his own trial. That Vega–Lara had not intended to kill the victim was an important fact in the defense's case, and Morales's counsel referenced the question and answer in his closing argument to the jury. This fact further undercuts the majority's assertion that Morales suffered unfair prejudice due to Vega–Lara's refusal to answer questions.

I would hold that because the prosecutor was attempting, in good faith, to lay the foundation for the admission of substantive evidence, the prosecutor's action was justified and not "clearly indefensible as a matter of law." *Mitchell*, 268 Minn. at 517, 130 N.W.2d at 131. This conclusion, together with the fact that Vega–Lara was subject to cross-examination on the critical issue of intent, confirm that the State's questioning of Vega–Lara did not unfairly prejudice Morales.

The only case where we have reversed a conviction based, in part, on a violation of the rule adopted in *Mitchell*—*State v. Jones*, 277 Minn. 174, 152 N.W.2d 67 (1967)—reinforces my conclusion. In *Jones*, the defendant was charged with burglary and assault and the State alleged that he committed the crimes with William Cozart. 277 Minn. at 176, 152 N.W.2d at 70–71. During the defendant's trial, the State called Cozart, who "testified in detail" as to how the burglary was committed and as to his participation in it. *Id.* at 180, 152 N.W.2d at 73. But Cozart declined to answer all questions posed regarding the defendant and the defendant's alleged involvement in the crimes. *See id.* at 180, 152 N.W.2d at 73. The State recalled Cozart as a rebuttal witness and he again refused to answer questions regarding the defendant. *See id.* at 181, 152 N.W.2d at 73–74. We said that "[i]t must be assumed that the state was fully aware of the answers it would receive" to the questions Cozart refused to answer "because Cozart had taken the same position at his arraignment and when questioned in the hospital shortly after the burglary." *Id.* at 181–82, 152 N.W.2d at 74.

We grounded our conclusion of unfair prejudice in the way the State used Cozart's refusals to answer in its closing argument. The State stressed to the jury that Cozart went " 'through the whole works. . . . He will tell us all, except one thing. . . . He won't say it was the defendant. But he won't do something else. He also won't deny that it was the defendant.' " *Id.* at 183, 152 N.W.2d at 74–75. Based on this argument, we concluded that the State "did everything it could to implant prejudice in the minds of the jury by

leaving with them the feeling that Cozart's failure to testify pointed to defendant's guilt.... The type of argument used destroys any semblance of a fair trial." *Id.* at 184, 152 N.W.2d at 75. In other words, because the State directly suggested to the jury that they should infer the defendant's guilt from Cozart's refusal to implicate the defendant in the crime, we held that the defendant's right to a fair trial was violated. *Id.* at 189, 152 N.W.2d at 78.

Unlike in *Jones*, the State in this case did not rely on Vega–Lara's non-answers to argue that Morales was guilty. The State also did not suggest to the jury that it should infer Morales's guilt based on Vega–Lara's invocation of privilege. The majority does not cite *Jones* in its discussion of unfair prejudice. In my view, *Jones* compels the conclusion opposite that reached by the majority.

In sum, the State's attempt to lay the foundation for the admission of Vega–Lara's testimony was done in a good faith attempt to respond to Vega–Lara's assertion of a nonexistent privilege. Because the State's questions were grounded in our rules of evidence, and because Vega–Lara was subject to cross-examination in an important, material respect, I would conclude that Morales was not subjected to unfair prejudice. I therefore would reverse the court of appeals and affirm Morales's conviction.